FIRST AMERICAN BANK OF NASHVILLE, N.A., Trustee, Plaintiff–Appellee,

v.

Frank A. WOODS, L. Daniel Scott, and Joe R. Hyde, III, Defendants–Appellants.

Court of Appeals of Tennessee, Middle Section at Nashville.

Sept. 6, 1989.

Application for Permission to Appeal Denied by Supreme Court Nov. 27, 1989.

Hugh C. Howser, Charles C. Trabue, Jr., Trabue, Sturdivant & DeWitt, Nashville, for plaintiff-appellee.

Larry D. Woods, Woods & Woods, Nashville, for defendants-appellants.

## OPINION

LEWIS, Judge.

Defendants, Frank A. Woods, L. Daniel Scott, and Joe Hyde III,[1] have appealed from a judgment entered against them and in favor of plaintiff, First American Bank of Nashville, N.A., Trustee (Trustee), following the trial court's finding that the Trustee did not "unreasonably" withhold its consent to allow Performance Systems, Inc. (PSI) to assume a lease on which Defendants Woods, Scott and Hyde were Guarantors.

This case, which arose out of a lease entered into between the Trustee and Chicken System of America, Inc, has in one form or another been before this Court or the Supreme Court on several occasions.[2]

The facts pertinent to a resolution of the issues before us are as follows:

Shortly before 28 May 1968, the plaintiff was appointed Trustee of a parcel of property owned by Chester A. Atkins. On 28 May 1968, the Trustee and Chicken System of America, Inc. entered into a fifteen-year lease agreement (the Agreement) for the Atkins property to be used as a fast-food restaurant. Defendants Woods, Scott and Hyde guaranteed Chicken System of America, Inc.'s performance of the Agreement.

The portions of the lease pertinent to our inquiry provide as follows:

> 20. If Lessee (a licensee of Minnie Pearl's Chicken System, Inc.) shall be in default under any provisions of this lease and Lessor desires to terminate same, or if Lessee is in default under any of the provisions of his license agreement with Minnie Pearl's Chicken System, Inc., and Minnie Pearl's Chicken System, Inc. desires to terminate said agreement, Lessor and Lessee agree that Minnie Pearl's Chicken System, Inc. shall have the right to assume said lease from Lessor upon the same terms and conditions.

Section 24 of the lease provides:

> 24. Subject to all other terms and provisions of this lease agreement, it is understood and agreed that Lessee may sub-lease said property to another tenant who will sign and assume full responsibility for the remaining terms and all of the conditions of this lease, but same may be done only with the written consent of the Lessor, which shall not be unreasonably withheld. If and when Lessor's written approval is obtained, Lessee will be released from all further liability and responsibility hereunder.

Neither Chicken System of America, Inc., PSI, nor the Guarantors notified the Trustee that on 30 April 1969 Chicken System and PSI had entered into an agreement whereby PSI agreed to assume responsibility for the Agreement and that as of 1 May

---

**1.** We will hereafter refer to the Defendants Woods, Scott and Hyde individually by name or collectively as Guarantors.

**2.** For a history of the litigation and a detailed statement of facts, see *First Am. Bank of Nashville v. Woods,* 734 S.W.2d 622 (Tenn.App.1987).

1969 PSI had entered into possession of the premises covered by the Agreement.

The Trustee learned that PSI had entered into possession when it was notified by an insurance agent who had carried insurance on the leased property that the insurance had been cancelled and that PSI, not Chicken System, was operating the restaurant.

Subsequent to 1 May 1969, the Guarantors requested the Trustee to consent to the assignment of the Agreement from Chicken System to PSI and to release the Guarantors from their guaranty.

The Trustee, in a letter to the Guarantors, refused to consent to the assignment *unless* the Guarantors continued their guaranty of the lease Agreement.

Defendant Woods, on behalf of himself and the other Guarantors, advised the Trustee that the Guarantors considered the action of the Trustee in refusing to consent to the assignment and releasing them from their guaranty to be unreasonable and in violation of the Agreement.

Several letters passed between the Trustee and/or its attorney and the Guarantors and/or their attorneys. However, the bottom line was that the Trustee refused to consent to the assignment to PSI unless the Guarantors remained as guarantors of the Agreement.

Following an evidentiary hearing, the Chancellor found in part as follows:

> This Court finds that First American Bank, Trustee did not unreasonably withhold consent to the subleasing or assignment of the lease to PSI. The Trustee considered the financial viability of PSI and correctly determined, based on PSI's financial statements and prospectus, (exs. 69–72 and 77) that PSI's financial condition was so uncertain that it could not reasonably consent to a sublease or an assignment of the lease to PSI, without the Defendant guarantors agreeing to remain obligated under the provisions of the lease.

We "review ... findings of fact by the trial court in civil actions ... de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn.R.App.P. 13(d). The burden is upon the appellant to show that the evidence preponderates against the findings of the trial court. *Capital City Bank v. Baker,* 59 Tenn.App. 477, 493, 442 S.W.2d 259, 266 (1969).

We first address the issue of whether the Trustee "unreasonably withheld consent to a sublease or assignment under the facts and circumstances of this case."

The Trustee, pursuant to section 24 of the Agreement, "shall not-unreasonably" withhold its consent to an assignment of the lease.

■ The standard usually applied in determining whether withholding of consent was reasonable is expressed as a reasonable commercial standard. *See Homa–Goff Interiors, Inc. v. Cowden,* 350 So.2d 1035, 1038 (Ala.1977). The standard is generally understood to include the elements of "good faith," *Amjems, Inc. v. F.R. Orr Constr. Co.,* 617 F.Supp. 273, 278 (S.D.Fla. 1985), and "fair dealing." *Brigham Young Univ. v. Seman,* 206 Mont. 440, 445, 672 P.2d 15, 18 (1983). The question is whether the landlord's conduct is that of "a reasonably prudent person ... exercising reasonable commercial responsibility." *Id.* at 447, 672 P.2d at 18 (citations omitted).

■ A landlord may not withhold consent because of personal whim or taste, or other arbitrary reasons, when the lease provides that consent to an assignment will not be unreasonably withheld. *Broad & Branford Place Corp. v. J.J. Hockenjos Co.,* 132 N.J.L. 229, 231, 39 A.2d 80, 82 (1944). The Trustee had a duty to act in good faith. *Knox County v. Fourth & First Nat. Bank,* 181 Tenn. 569, 581, 182 S.W.2d 980, 984 (1944). A primary factor in determining whether a landlord acted in good faith and in a commercially reasonable manner is the "financial responsibility of the proposed subtenant." *Fernandez v. Vazquez,* 397 So.2d 1171, 1174 (Fla.Dist.Ct. App.1981). In considering the proposed assignee's finances, an analysis should focus on the reasonableness of the landlord's per-

ception that the proposed tenant presented financial or other risks. *Fahrenwald v. LaBonte*, 103 Idaho 751, 756, 653 P.2d 806, 811 (App.1982).

In making a determination of whether to withhold its consent, it is unreasonable for a landlord to take into consideration "personal taste, convenience or sensibility." *Brigham Young Univ. v. Seman*, 206 Mont. at 447, 672 P.2d at 18. The landlord's desire "to extract an economic concession," *1010 Potomac Assocs. v. Grocery Mfrs. of Am.*, 485 A.2d 199, 210 (D.C.1984), or "philosophical or ideological differences with [a] subtenant," *Id.* at 209 n. 14, may not be taken into consideration.

█ Normally, the standard for determining the reasonableness of consenting or withholding consent under a lease is to make a comparison of the financial stability of the present tenant and/or guarantors as contrasted to the proposed assignee.

█ In the trial court, the Guarantors had the burden of proving that the Trustee acted unreasonably.

To carry this burden, the Guarantors relied mainly on the argument that PSI in 1968 was in a much better financial condition than were the Guarantors. It is their insistence that at the time their combined net worth was $1,125,000 and that PSI had a net worth of $11,700,000.

They argue that the evidence was "overwhelming[ly]" in favor of finding that the Trustee acted unreasonably and that the preponderance of the evidence is against the findings of the Chancellor that the Trustee did not act unreasonably. If only the evidence of the Guarantors is considered, this statement may be true. However, it is necessary that the trial court and this Court consider all of the evidence in order to determine where the preponderance lies.

At trial, both the Trustee and the Guarantors relied on PSI's annual report for 1968 and a preliminary prospectus prepared in the late spring of 1969. The evidence shows that PSI had been incorporated in June 1967. There was no showing of its ability to compete successfully in the fast-food market. The evidence is that in 1969 PSI was contemplating entering other businesses and there was no showing that it possessed expertise in any of these businesses.

Joe Kraft, a Certified Public Accountant employed by Chester A. Atkins, the owner of the leased property, testified that he was "not enthusiastic" for Atkins to build a single purpose restaurant "for a company that was not—was still in its early stages." When he was told that the tenants would be Woods, Scott and Hyde, he felt it would be a good project. He was later told that Chicken System of America, Inc. would be the lessee but also was told that "these three gentlemen [the Guarantors] were going to unconditionally guarantee the lease. So I felt that under these conditions and circumstances it was still a good deal for Chet, and I so advised him."

Later, when the question of the advisability of allowing the lease to be assigned to PSI and releasing the Guarantors arose, he examined the 1968 annual statement and the 1969 prospectus of PSI. He knew there had been a significant decline in the market price of PSI stock and expressed concern about certain items appearing in the report and prospectus. Among these were the "recognition of income from the sales of franchises," especially recognition as income of "the full sales price upon receipt of a down payment regardless of whether anything had been done towards getting the store started or providing any service relating to the franchisees;" that a major portion of the assets of PSI was represented by notes and most of these were from the sale of franchises; that PSI at that time did not have any kind of operating history "and I think that's always the key as to whether you're going to have a successful operation or not, not necessarily how many franchises you sell, but whether or not you can operate successfully; that from a purely operating standpoint the company [PSI] appeared to be showing significant losses when the franchise income was taken out;" that he personally did not mind another operator or someone else on the lease but that he was "quite con-

cerned" about not having the Guarantors remain as Guarantors of the lease and that this was what he was "relying on when I recommended Chet to go into the deal."

The Guarantors put much stock into the fact that PSI had just purchased Royal Castle, a restaurant chain. Mr. Kraft testified regarding Royal Castle as follows: "I would be very concerned about Royal Castle" because "it's got its net worth in its real estate" and had a steady decline in pretax net income.

He testified that the officers and directors of PSI were

"nice, fine people ... but none of them were experienced in operating chicken companies. And, you know, unfortunately I had been in the restaurant business once and I had had some experience with it first hand ... and I didn't see anybody in the organization that I felt like was really focusing on that aspect [the operation] of it. Most everybody they had were financial people. Not operational people."

Frank Cole, who had headed the Trustee's trust department for several years and was at the time he retired in 1974 a senior vice president and director of the Trustee bank, testified that J.W. Coles succeeded him as head of the trust department. Frank Cole testified that he was very familiar with PSI and that he had invested some of his own money in it, being "one of the original subscribers to stock in it."

He further testified that on several occasions he and J.W. Coles discussed the question of whether the bank should accept PSI as lessee and release the Guarantors. Mr. Cole knew that the market price of PSI stock was declining substantially in 1969 and "at the beginning of 1969 the market price was $18 and by the July date it had dropped to a about eight and one half or nine"; that "based on the information that I had, I felt very confident that the bank had no right or judgment to release the obligors, the lessees at the time."

William Midget, a trust officer at the Trustee bank, conferred with J.W. Coles, Mr. Kraft, and Ernest Matthews, the attorney who represented Mr. Atkins and also represented the Trustee concerning "the financial ability of PSI." Mr. Midget also had discussions with Lane Abernathy, G.F. Cole, and Andrew Benedict, all officers of the Trustee Bank regarding the request of Chicken System that the lease Agreement be assigned to PSI.

Mr. Midget saw and reviewed the financial statements of PSI. In regard to each of the persons with whom he discussed the request, including Mr. Matthews, their concern was that although the statements showed substantial revenues and substantial net worth, an analysis of the statements showed "they were primarily from the sale of franchises ... and not from the sale of fried chicken."

Mr. Midget, in response to a question from the Chancellor regarding whether it made any difference whether the net worth and revenues of PSI came from the sale of franchises or from the sale of chicken, explained: "Because we were looking for a fifteen-year guarantee. So taking the long view, the sale of franchises appeared to be a temporary thing, assuming that all the franchises that were sold were paid for. Again, the statements showed that most of the franchises were sold on credit."

From our review of the entire record, we are of the opinion that the evidence does not preponderate against the finding of the Chancellor that the Trustee did not act "unreasonably" in refusing to consent to the assignment of the lease agreement.

We are of the opinion that the evidence shows that the Trustee did make a reasonable investigation.

This issue is without merit.

Plaintiff also raises the issue of whether or not the "Trustee's claim is barred by the doctrine of laches since [the Trustee] has long neglected or omitted to assert its claim."

This issue was raised in *First Am. Bank of Nashville v. Woods*, 734 S.W.2d 622 (Tenn.App.1987). We found it to be without merit.

In disposing of this issue, we stated:

The omission to bring suit against the Guarantors at an earlier time was brought about at the Guarantors' request and not through neglect on the part of the Trustee. If the Guarantors have been prejudiced by the lapse of time, it has been because of their requests. The Trustee's claim is not barred by laches.

*Id.* at 632. The law of the case regarding the question of laches is that the Trustee's claim is not barred by laches.

We have considered the issues raised by the Guarantors and find each to be without merit. The judgment of the Chancellor is therefore affirmed with costs assessed to the Guarantors and the cause remanded to the Chancery Court for the collection of costs, the enforcement of the judgment of the Chancery Court, and for any further necessary proceedings.

TODD, P.J., and CANTRELL, J., concur.