# IN THE COURT OF APPEALS OF TENNESSEE
# AT JACKSON
### August 23, 2011 Session

## SHREE KRISHNA, LLC, D/B/A QUIZNO'S CLASSIC SUBS
### v.
## BROADMOOR INVESTMENT CORP.

**An Appeal from the Chancery Court for Madison County**
**No. 66126      James F. Butler, Chancellor**

---

**No. W2011-00514-COA-R3-CV - Filed February 1, 2012**

---

This case involves the breach of a commercial lease.  The plaintiff leased property from the defendant for a franchise restaurant.  The lease granted the plaintiff options to renew for two additional lease periods.  The parties' agreement with the franchisor provided that the lease and the options were assignable, and that the landlord's consent to the assignment could not be unreasonably withheld.  The plaintiff sought to assign the lease and the renewal options to a third party.  The defendant landlord refused to consent to the assignment and attempted to negotiate a new lease with the prospective assignee on different terms.  After the assignee withdrew its offer to purchase the plaintiff's franchise, the plaintiff agreed to sell it to the assignee for a reduced price.  The plaintiff then filed this lawsuit against the defendant landlord for breach of contract, alleging that it unreasonably withheld consent to the original proposed assignment.  After a bench trial, the trial court held in favor of the plaintiff.  The defendant landlord now appeals.  We affirm, finding that the evidence supports the trial court's conclusion that the defendant landlord unreasonably withheld consent in order to extract an economic concession or improve the landlord's economic position.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

S. Newton Anderson and Paul R. Sciubba, Memphis, Tennessee, for the Defendant/Appellant Broadmoor Investment Corp.

Lewis L. Cobb and Sara E. Barnett, Jackson, Tennessee, for the Plaintiff/Appellee Shree Krishna, LLC, d/b/a Quizno's Classic Subs

# OPINION

## FACTS AND PROCEEDINGS BELOW

In 2002, Hasmukh D. Patel, M.D. ("Dr. Patel"), a physician, and his wife, Chandra Patel ("Ms. Patel"), decided to purchase a Quizno's sub shop franchise to be operated by their son, Manish "Mike" Patel ("Mike"). Toward that end, Ms. Patel and Mike formed a limited liability company, Plaintiff/Appellee Shree Krishna, LLC ("Shree Krishna"), for the purpose of owning and operating the Quizno's franchise.[1]

On January 10, 2003, Shree Krishna ("Tenant") entered into a commercial lease ("Lease") with Defendant/Appellant Broadmoor Investment Corp. ("Landlord") to lease shopping center property at 143 Stonebrook Place, Suite H, in Jackson, Tennessee, out of which it operated the Quizno's franchise. The Lease was for an initial term of five years, or 60 months, from the "Commencement Date" of May 1, 2007. The parties also executed an addendum to the Lease required by Landlord ("Landlord's Addendum"). The Landlord's Addendum granted Tenant an option to renew the Lease, specifically, an "option to extend the term of this Lease for two (2) additional periods of sixty (60) months upon the same terms and conditions" as the original Lease, with modifications in price. To exercise the renewal option, the Landlord's Addendum required Tenant to notify Landlord in writing of the intent to renew at least 180 days (six months) prior to the expiration of the current Lease term. The Landlord's Addendum prohibited assignment of the renewal option, and provided that if Tenant did not exercise the first renewal option, Tenant had to reimburse Landlord half of the estimated build-out costs of the space, a total of $29,185.00.

As franchisor, Quizno's required Tenant to include its own required addendum ("Quizno's Addendum") to the Lease. The Quizno's Addendum basically overrode any contrary provisions in the other parts of the Lease.[2] To facilitate transfer of the Quizno's franchise, the Quizno's Addendum permitted Tenant to assign the Lease:

> 1. ASSIGNMENT PROVISIONS. Tenant shall agree to attorn to any assignee of Landlord provided such assignee will agree not to disturb Tenant's possession of the Premises. Tenant shall have the right to assign this Lease or

---

[1]Though Dr. Patel was somewhat involved in the Quizno's business, Ms. Patel and Mike were the only two members of Shree Krishna.

[2]The Quizno's Addendum provided that its terms "shall control and be interpreted in such a manner as to override any provision in the Lease which would prevent the spirit and letter of the terms and provisions from this [Quizno's] Addendum from being given full force and effect."

sublet the Premises, without charge and without Landlord's consent or sublet the Premises, without charge and without Landlord's consent being required[,] to The Quizno's Franchise Company ("TQFC"), or its parent, subsidiaries, or affiliates (TQFC, its parent, subsidiaries and affiliates are each referred to herein as a "TQFC Entity") or to a duly authorized franchisee of TQFC <u>with Landlord's consent not to be unreasonably withheld or delayed</u>.  In the event of an assignment to a TQFC Entity, the TQFC Entity shall have the right to reassign the Lease, without charge and <u>with Landlord's consent not to be unreasonably withheld or delayed</u>, . . . to a duly authorized franchisee of the TQFC Entity and . . . thereupon <u>TQFC Entity shall</u> be released from any further liability under the Lease, <u>at which time the authorized franchisee of TQFC together with the Tenant shall be responsible for the Lease</u>. *Any options to extend the term of the Lease shall automatically transfer to an assignee in connection with a transfer made pursuant to the foregoing.*

(Underlining in original, italics added).  Thus, although the Landlord's Addendum prohibited the assignment of the renewal options, the Quizno's Addendum provided that the Lease was assignable, and also stated that "[a]ny options to extend the term of the Lease shall automatically transfer to an assignee in connection with a transfer . . . ."  The Tenant had the right to assign the Lease to Quizno's[3] without Landlord's consent.  The Quizno's Addendum gave Tenant the right to assign the Lease to a "duly authorized" Quizno's franchisee "with Landlord's consent not to be unreasonably withheld or delayed."  According to the last sentence, renewal options "automatically transfer" with the assignment of the Lease, but the parties dispute whether this provision applies to an assignment made to a franchisee. Landlord and Tenant both signed the Quizno's Addendum, and it was attached as part of the original Lease when the Lease was made.

For several years, Tenant operated the Quizno's franchise out of the leased property.  Ms. Patel and her son each worked full-time at the restaurant; Ms. Patel would open the restaurant each morning and work until her son came to work each afternoon.  Ms. Patel maintained that it was necessary to have a family member at the restaurant at all times to prevent employees from pilfering the restaurant's inventory.[4]

---

[3]The Quizno's Addendum uses the defined terms TQFC (The Quizno's Franchise Company) and TQFC Entity (The Quizno's Franchise Company or its parent, subsidiaries, or affiliates).  For ease of reference, we will refer to Quizno's as inclusive of all.

[4]Ms. Patel called it "meat walks out of the freezer" when employees would filch the restaurant's sub sandwich supplies.

In approximately January 2006, the Patels' son Mike decided that he no longer wanted to work at the Quizno's restaurant. Once he stopped working at the restaurant, the burden of managing it fell to Ms. Patel, who thereafter was working both the day and evening shifts every day. The Patels had purchased the franchise for their son, and Ms. Patel did not want to continue working double shifts at the restaurant every day, so the decision was made to sell the business.

The Patels searched for someone to purchase the business. In March 2007, they finally found a prospective purchaser, Stonebrook Quiz, LLC, owned by Rajesh Aggarwal[5] ("Mr. Aggarwal") and his nephew/business partner, Manish "Mac" Kharat.[6] The agreed-upon sales price was $210,000 plus inventory. The sale of the Quizno's business was made contingent upon the assignment of the Lease and upon Quizno's approval for new ownership.

Around that time, Tenant notified Landlord that it wanted to assign the Lease to Mr. Aggarwal and requested Landlord's consent to do so per the Quizno's Addendum. Consent to the assignment was not immediately given by Landlord.

In June or July of 2007, the Quizno's franchise approved Mr. Aggarwal as a franchisee. The transfer of the Quizno's franchise from Tenant to Mr. Aggarwal was scheduled for late July 2007. Landlord's consent to the assignment of the Lease was necessary to effectuate the transfer.

Landlord and Mr. Aggarwal began communicating directly about Landlord's consent to the assignment of the Lease. Many of their communications were by email, primarily between Mr. Aggarwal and two representatives of Landlord, Bill Scarbrough ("Mr. Scarbrough") and Justin Sterling ("Mr. Sterling"). The email exchanges reflect that Mr. Aggarwal sought Landlord's consent to the assignment of the ten months remaining on the original Lease as well as the two five-year renewal options. A June 20, 2007 email from Mr. Sterling to Mr. Scarbrough states Mr. Sterling's opinion that "[i]t's **not reasonable** for any Landlord to assign a lease **with less than a year remaining** on the term," and "[a] **Franchisee to Franchisee** assignment does not meet the qualification for the renewal options to automatically transfer." (Emphasis in original). On this basis, Landlord concluded that it could reasonably withhold its consent to the assignment of the existing Lease. According to Landlord's interpretation of the Lease and the addenda, it was also not obligated to assign

---

[5]Mr. Aggarwal is a professor at Middle Tennessee State University.

[6]Most of the business dealings with Stonebrook Quiz, LLC, were through Mr. Aggarwal.

the renewal options along with the Lease.[7]  In the negotiations with Mr. Aggarwal, Landlord effectively gave Mr. Aggarwal three options:  (1) sublease the space from Tenant, in which case Tenant would remain liable under the Lease and would lose the option to later assign the Lease to Mr. Aggarwal, (2) agree to an assignment of the Lease for 70 months, with only one renewal option, or (3) agree to an assignment of the Lease for the remaining ten months on the original Lease term, with only one renewal option.[8]  Under the second and third alternatives, Landlord would require the $29,185 build-out fee to be placed in escrow, to be forfeited in the event that Mr. Aggarwal did not exercise his renewal option.  Mr. Aggarwal did not find any of these options acceptable, and so the parties reached an impasse.

In an effort to break the impasse, Tenant contacted representatives at Quizno's for assistance, to no avail.  Quizno's delayed the transfer of the franchise from Tenant to Mr. Aggarwal until the assignment of the Lease was complete.

Frustrated by Landlord's intransigence, on July 23, 2007, Mr. Aggarwal withdrew his offer to purchase the Quizno's business from Tenant.  Mr. Aggarwal explained that he was unwilling to go through with the purchase without the assignment of the original Lease and both five-year renewal options, commenting that he was "not willing to buy a business for only a period of 5 years."  On this basis, Mr. Aggarwal informed Tenant that he would not be purchasing the Quizno's business.

By that time, the negotiations had consumed several months.  When Mr. Aggarwal withdrew his offer, the October 31, 2007 deadline for Tenant to exercise the first five-year renewal option was approaching.  At that point, Tenant would be faced with either renewing the Lease on a franchise that Ms. Patel did not want to continue to run by herself or pay the $29,185 "build-out cost" penalty for not renewing.  Ms. Patel was exhausted and despairing.

In August 2007, Tenant and Mr. Aggarwal renegotiated the sale of the Quizno's business.  Mr. Aggarwal agreed to purchase the Quizno's business for a lower price, $150,000, and accept Landlord's offer to consent to the assignment of the remaining months of the original Lease with one five-year renewal option. Thus, on September 25, 2007, Tenant entered into an Assignment of Lease ("Assignment") with Mr. Aggarwal, to be effective on October 1, 2007.  The Assignment was also signed by Landlord.  With respect to the renewal options, the Assignment provided that the first five-year renewal option would be assigned to Mr. Aggarwal, but the second option would not.  In addition, the Assignment required either

---

[7]Initially, Landlord informed Mr. Aggarwal that there was an "assignment fee" of $1,000.  It later recognized that this was erroneous and the request for the "fee" was withdrawn.

[8]The original Lease was set to expire on April 30, 2008.

Tenant or Mr. Aggarwal to deposit the build-out cost of $29,185 into escrow. Although Tenant's original agreement required Mr. Aggarwal to make this deposit, in the renegotiated arrangement, Tenant made this deposit.

In order to operate a Quizno's franchise, Quizno's required a prospective owner to first be approved by Quizno's, and then to undergo specific training on sandwich-making and running a Quizno's store in order to become "certified." During the negotiations, Quizno's approved Mr. Aggarwal to own the Quizno's franchise, but he was not yet certified to operate it. To facilitate the sale of the business, in May 2007, Mrs. Patel temporarily became a member of Mr. Aggarwal's LLC, Stonebrook Quiz, LLC, because she was already certified to operate the Quizno's business. In January 2008, Mr. Aggarwal's nephew and business partner, Mac, completed the necessary training and became certified to operate the Quizno's franchise, and Mrs. Patel resigned her membership in Stonebrook, LLC.

Mr. Aggarwal and Mac operated the Quizno's business for several months, but they decided not to exercise the renewal option. Consequently, Tenant forfeited the $29,185 it had placed in escrow with Landlord.

On April 16, 2009, Tenant filed this lawsuit against Landlord, alleging that Landlord breached the Lease by wrongfully withholding consent to assign the Lease in full to Mr. Aggarwal.[9] Tenant claimed that Landlord's unreasonable withholding of consent to assign the second renewal option to Mr. Aggarwal caused Tenant to lose $60,000 from the reduction in sales price of the Quizno's business and the $29,185 it had placed in escrow for the build-out costs. Landlord filed an answer denying liability. Discovery ensued.

On May 11, 2010, Landlord filed a motion for summary judgment, claiming that Tenant had waived its breach of contract claims against Landlord by executing the September 2007 Assignment, and that Landlord "had no obligation to allow [Tenant] to assign the lease to a third-party." In response, Tenant argued that the September 2007 Assignment to Mr. Aggarwal at a reduced price was an attempt to mitigate the damages caused by Landlord's breach. Tenant also argued that Landlord's withholding of consent to the assignment of all of the Lease provisions to Mr. Aggarwal was unreasonable and constituted a breach of the Lease. On July 13, 2010, the trial court entered an order denying Landlord's motion for summary judgment, finding that genuine issues of material fact existed for trial.[10] The case was set for trial.

_____

[9]On July 7, 2010, the trial court permitted Tenant to amend its complaint.

[10]The trial court attached and incorporated into its order a July 12, 2010 letter ruling explaining its decision in more detail.

On July 14, 2010, the trial court conducted a bench trial on the merits. The trial court heard testimony from Dr. Patel, Ms. Patel, and Mr. Scarbrough as the representative of Landlord.[11] The testimony focused primarily on the dealings between the parties and the reasons for Landlord's decision to withhold its consent to the assignment of the existing Lease and two renewal options.

Dr. Patel testified that he conducted the negotiations between Tenant and Mr. Aggarwal in the sale of the Quizno's business. He stated that the original agreement with Mr. Aggarwal did not close because Landlord would not assign the Lease with the two renewal options to Mr. Aggarwal. After the impasse with Landlord over the assignment and Mr. Aggarwal's decision to back out, Dr. Patel negotiated the new agreement with Mr. Aggarwal. Under the new sales agreement, Dr. Patel said, Tenant agreed to accept $60,000 less for the business and place into escrow the $29,185 build-out cost penalty for failing to renew. Dr. Patel believed that he had no choice but to accept this less attractive offer to induce Mr. Aggarwal into buying the business, because the only alternative was to lose his entire investment. By way of explanation, Dr. Patel commented that getting "[s]omething is better than nothing."

Ms. Patel also testified at trial. She explained the process Quizno's required in order to operate a Quizno's franchise. In order to obtain Quizno's approval or authorization to own the Quizno's franchise, Tenant was required to send to the Quizno's main office financial statements and other such documents. Once Quizno's "approved" or "authorized" Tenant to be a franchisee based on the financial statements, Quizno's gave Tenant a certain amount of time for personnel to travel to the Quizno's facility in Denver, Colorado, to undergo weeks of training in sandwich-making and other operational matters in order to become certified to operate the Quizno's business.

Ms. Patel testified that, in July 2007, during the negotiations with Landlord, Mr. Aggarwal was approved to own a Quizno's franchise, but not yet certified. She said that at no time during negotiations did Landlord indicate that its refusal to consent to the assignment was based on the belief that Mr. Aggarwal was not a "duly authorized franchisee" of Quizno's.

Ms. Patel testified that her attempts to get Landlord's consent to the assignment of the original Lease were fruitless. During the negotiations, she stated, Landlord received Mr. Aggarwal's verified financial statements, but nevertheless refused to consent to the assignment of the second renewal option to Mr. Aggarwal. On top of that, she said, Landlord attempted to charge Tenant a $1,000 fee to make the assignment, although this charge was later withdrawn. Frustrated by Landlord's position, Ms. Patel said, Mr. Aggarwal withdrew

[11]In addition to the testimony at trial, the trial court reviewed the deposition testimony of Mike, Mr. Sterling, and Mr. Aggarwal.

his offer to purchase the franchise.  Mr. Aggarwal later relented and agreed to the sale, albeit at a lower price.  The email exchanges among Tenant, Landlord, and Mr. Aggarwal were submitted into evidence.

Landlord's representative Mr. Scarbrough testified as well.  At the time of the negotiations with Mr. Aggarwal, Mr. Scarbrough said, Landlord had received advice that the Quizno's Addendum, mandating assignment of any renewal options along with any assignment of the Lease, would not apply to any transaction with Mr. Aggarwal, and Landlord's actions were based on that advice.  At the time of trial, Mr. Scarborough still believed that to be the case.

Mr. Scarbrough said that, in negotiating the assignment of the Lease on behalf of Landlord, he was "trying to do whatever he could to help [the Patels] get their deal done.  But at the same time [he couldn't] do something that's bad for [Landlord]."  He further claimed that, at the time of the negotiations, he was concerned that Mr. Aggarwal would make a bad tenant, because after negotiations began, Mr. Aggarwal refused to disclose his financials and failed to confirm his franchisee status.  Mr. Scarbrough also noted his impression that Mr. Aggarwal was very difficult to work with, based on Mr. Aggarwal's rejection of Landlord's offer of a new lease that would have given him 70 months plus one five-year option at the original lease rates in lieu of an assignment of the existing Lease.[12]  Mr. Aggarwal's refusal to agree to the 70-month proposal raised a "red flag," Mr. Scarbrough said, because most new tenants want a new lease.  In the portions of his deposition that were read into evidence, Mr. Scarbrough testified that Landlord was operating under the belief that it was not required to consent to the assignment of the renewal options and that "[i]t was bad business to do so."  He stated that there were only ten months remaining on the original Lease, "and we had no assurances from [Mr. Aggarwal] that he was going to stay, [and] we didn't feel like it was a very good deal for us.  I mean, it wasn't – there were too many unresolved questions about Mr. Aggarwal."

On cross-examination, Mr. Scarbrough admitted that he had testified in his deposition that Landlord's rationale for declining to consent to a straight assignment of the Lease and both renewal options was because "under the terms of the lease we were not required to extend the option.  It was bad business to do so."  From Landlord's perspective, Mr. Scarbrough said, "We would love to have had [Mr. Aggarwal] locked in [to the Lease] for ten years."  Mr. Scarbrough agreed that if a landlord has a tenant such as Mr. Aggarwal locked in, the landlord is in a better negotiating position.  He conceded that Mr. Aggarwal eventually provided Landlord the required financial information, and that Mr. Aggarwal was in fact financially qualified to have the Lease assigned to him:

---

[12]Mr. Scarbrough complained that Mr. Aggarwal "didn't want to do something that would be good for all of us.  He wanted to do it his way or no way, and that – it did not necessarily work for us."

Q: . . . Mr. Aggarwal, once he provided you with the financial information, was a qualified person to have the lease assigned to him or his business?
A: Financially, yes.
Q: Well, he must have been qualified because y'all eventually approved the assignment, didn't you?
A: Yes.

Mr. Scarbrough maintained that Landlord acted reasonably under the circumstances.

On January 4, 2011, the trial court issued a letter ruling holding in favor of Tenant.[13]  In its ruling, the trial court determined that, under the Quizno's Addendum,

[Tenant] made a proper request and gave proper notice of its intent to assign the Lease to Aggarwal and that [Landlord] breached the Lease agreement when it refused to allow assignment of the two options to extend to the proposed assignee, who was an authorized franchisee of [Quizno's] and who had been financially approved by [Landlord] as an assignee.

The trial court also determined that Landlord's breach of the Lease damaged Tenant in the amount of $60,000 by forcing Tenant to mitigate its damages and accept a lesser sales price for the Quizno's business, and also in the amount of $29,185, the amount Tenant had placed in escrow for build-out costs for failure to renew the Lease.  Accordingly, the trial court awarded Tenant $89,185 in damages, plus costs.[14]  On January 14, 2011, the trial court entered a "Final Judgment," incorporating the letter ruling by reference and awarding Tenant an additional $1,660.15 in discretionary costs.  From this order, Landlord now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, the primary issue Landlord raises for review is, "Whether the trial court erred in finding that [Landlord] breached the Lease Agreement when it refused to allow assignment

---

[13]The January 4, 2011 letter was filed with the trial court on January 5, 2011.

[14]The trial court also denied Tenant's request for attorney fees.

of the two options to extend to the proposed assignee."[15]  Under this umbrella, Landlord raises four sub-issues:

> 1.  Whether Landlord was obligated to assign the Lease under the Quizno's Addendum at all, much less the second renewal option?
> 2.  Whether Landlord had a reasonable basis for its failure to consent to the assignment of the second option?
> 3.  Whether Tenant waived its breach of contract claim when it voluntarily executed the September 2007 Assignment?
> 4.  Whether the trial court erred in determining that the September 2007 Assignment was brought about by economic duress of Landlord in attempting to force a new contract?

Because this was a bench trial, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *see Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 777 (Tenn. Ct. App. 2010).  Factual determinations based on a trial judge's assessment of witness credibility receive a high degree of deference, so we will not reverse a finding of the trial court based on credibility absent clear and convincing evidence to the contrary.  *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).  We review questions of law *de novo* with no presumption of correctness.  *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

In interpreting a contract, we must ascertain the intent of the parties and enforce the plain and ordinary language in the contract:

> The cardinal rule in the construction of contracts is to ascertain the intent of the parties.  If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms.  The language used in a contract must be

---

[15]Landlord also challenges the trial court's July 13, 2010 order denying its motion for summary judgment. However, "when the trial court's denial of a motion for summary judgment is predicated upon the existence of a genuine issue as to a material fact, the overruling of that motion is not reviewable on appeal when subsequently there has been a judgment rendered after a trial on the merits." *Arrow Elecs. v. Adecco Employment Servs., Inc.*, 195 S.W.3d 646, 650 (Tenn. Ct. App. 2005) (citing *Hobson v. First State Bank*, 777 S.W.2d 24, 32 (Tenn. Ct. App. 1989); *Mullins v. Precision Rubber Prods.*, 671 S.W.2d 496, 498 (Tenn. Ct. App. 1984); *Tate v. County of Monroe*, 578 S.W.2d 642, 644 (Tenn. Ct. App. 1978)).  Because the trial court's July 13, 2010 order denying Landlord's motion for summary judgment was based on the existence of genuine issues of material fact, and a judgment was rendered after a trial on the merits, the order denying summary judgment is not reviewable on appeal.

taken and understood in its plain, ordinary, and popular sense.  In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning.  If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties.  Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made.

***Pitt v. Tyree Org., Ltd.***, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (citations and internal quotation marks omitted).  Issues of contract interpretation are questions of law and, accordingly, are reviewed *de novo*.  ***Honeycutt v. Honeycutt***, 152 S.W.3d 556, 561 (Tenn. Ct. App. 2003).

## ANALYSIS

### Application of the Quizno's Addendum

The first issues raised by Landlord concern the applicability of the Quizno's Addendum. Landlord argues that: (1) Mr. Aggarwal was not a "duly authorized franchisee" of Quizno's at the time of the alleged breach, so the Quizno's Addendum did not apply; and (2) even if Mr. Aggarwal were considered a "duly authorized franchisee," the renewal options did not automatically transfer to a "duly authorized franchisee" with an assignment of the Lease. We will address each of these arguments in turn.

### *Duly Authorized Franchisee*

The Landlord argues that Mr. Aggarwal was not a "duly authorized franchisee" of Quizno's within the meaning of the Quizno's Addendum when the alleged breach occurred, and therefore the Quizno's Addendum is inapplicable, and the renewal options were not assignable per the terms of the Landlord's Addendum.[16]  Landlord notes that, during the time period in which the alleged breach occurred, roughly June through September 2007, neither Mr. Aggarwal nor his nephew Mac were certified by Quizno's to be a franchisee.  Landlord insists that Mr. Aggarwal did not become "authorized" by having Ms. Patel (who was already certified by Quizno's) join as a member of his LLC from May 2007 through March 2008, because she had no real ownership in the LLC, and having Mrs. Patel as a temporary LLC member was merely a "scheme to circumvent the Quizno's certification requirements." Landlord argues that Mr. Aggarwal and his LLC did not become a "duly authorized

---

[16]Landlord also argues that Mr. Aggarwal was not a Quizno's "Entity" within the meaning of the Quizno's Addendum, and Tenant does not dispute this.

franchisee" of Quizno's until Mac became certified to operate a Quizno's franchise in January 2008. This interpretation of the Quizno's Addendum, Landlord argues, is supported by the plain language of the Quizno's Addendum and by Ms. Patel's testimony at trial.

In her testimony, Ms. Patel described the process required by Quizno's to own and operate a Quizno's franchise. Ms. Patel appeared to use the words "authorized" and "approved," interchangeably; we look more to the substance of her testimony than the particular language used. Ms. Patel explained: "For authorized you have to send your financial statements, and the Quizno then looks at all your background and authorizes you to be a franchisee. . . . Once the Quizno approves from our financial, we are approved." Certification from Quizno's involved instruction and training in running a Quizno's franchise in the manner mandated by Quizno's. This involved first some training at any Quizno's restaurant, then a written examination on franchise rules and regulations, and then travel to the Quizno's facility in Denver, Colorado, for further instruction on Quizno's methods for making their sandwiches, hiring employees, and running a store. She described the stages of the process as (1) approval or authorization from Quizno's, based on an applicant's background and financial information, (2) transfer of the Lease, and (3) certification on Quizno's methods for their franchises.

The Quizno's Addendum was not the product of negotiations between these parties; rather, it was included in the Lease as a requirement of Quizno's. Therefore, we look to Quizno's intent in drafting its required addendum. The overall Addendum sets forth the process for a Quizno's franchise holder to transfer a lease for a Quizno's store location, either to (1) Quizno's or a corporate affiliate of Quizno's, or (2) another Quizno's franchishee. In the event that the franchisee assigns the Lease to Quizno's or a corporate affiliate of Quizno's (*i.e.*, a Quizno's "Entity"), the Landlord's consent to the assignment is not "required." If the lease is assigned to a "duly authorized franchisee" of Quizno's, either by the original franchise holder or by a Quizno's "Entity," then the assignment takes place "with Landlord's consent not to be unreasonably withheld or delayed." (Underlining omitted).

The apparent purpose of this provision of the Quizno's Addendum is to ease the transfer of a Quizno's franchise, including the lease for the physical store location, from one franchisee to a successor franchisee. A landlord would be acutely interested in the background and financial strength of a successor franchisee as a tenant; the landlord would have little reason to be interested in whether the successor franchisee had become indoctrinated in the Quizno's way of making sandwiches and running a Quizno's restaurant. This supports Ms. Patel's description of the overall process of becoming a Quizno's franchise holder; first approval by Quizno's based on the successor franchisee's background and financial information, then transfer of the lease for the physical store to the successor franchisee, and then certification in the Quizno's way of doing business. This reinforces Tenant's assertion

-12-

that a "duly authorized franchisee" within the meaning of the Quizno's Addendum is a successor franchisee who has been approved by Quizno's based on his background and financial information, but it does not require that the successor franchisee be "certified."

Landlord argues that an "authorized" Quizno's franchisee must be "certified" to operate a Quizno's store. As Tenant points out, however, Landlord offers no evidence to support this interpretation of the term "duly authorized franchisee" of Quizno's, but relies only on the plain language of the Quizno Addendum. We note also that Landlord never indicated to Mr. Aggarwal or Tenant during the negotiations that Landlord's basis for refusing to assign the entire Lease to Mr. Aggarwal was his lack of Quizno's certification.

In light of the plain language of the Quizno's Addendum, its purpose, and the uncontradicted testimony at trial, we find that Mr. Aggarwal was a "duly authorized franchisee" of Quizno's at the time of the alleged breach.

### *Automatic Transfer of Renewal Options*

Tenant based its right to assign the two renewal options along with the assignment of the Lease on the language in the last sentence in the Assignment Provisions of the Quizno's Addendum, which states: "Any options to extend the term of the Lease shall automatically transfer to an assignee in connection with a transfer made pursuant to *the foregoing*." (Emphasis added). Landlord argues that the term "foregoing" applies only to the immediately preceding sentence, which refers only to assignments made to a Quizno's "Entity," and that it does not apply to an assignment to a successor franchisee such as Mr. Aggarwal. Therefore, Landlord claims, its failure to consent to the transfer the two renewal options along with the assignment of the Lease to Mr. Aggarwal did not constitute a breach of the Lease. In response, Tenant argues that the term "foregoing" in the sentence at issue applies to the entire paragraph titled "Assignment Provisions," based on Quizno's purpose for this paragraph, that is, to make it easier for a Quizno's franchisee to sublet or assign the leased Quizno's store premises to a new Quizno's franchisee without delay or renegotiation of the Lease agreement. Consistent with this purpose, Tenant argues, the "automatic transfer" of renewal options with assignments of the Lease to either a Quizno's Entity or to a duly authorized franchisee of Quizno's are required by the Quizno's Addendum.

We note that the first paragraph of the Quizno's Addendum states that the Addendum should be "interpreted in such a manner as to override any provision of the Lease which would prevent the spirit and letter of the terms and provisions of this Addendum from being given full force and effect." We agree with Tenant that the "spirit" and purpose of the Assignment Provisions in the Quizno's Addendum is to facilitate a seamless assignment of the Lease, along with any renewal options, to either the parent company or to an entity that seeks to

operate a Quizno's franchise, specifically overriding any contrary non-assignment provision in a lease. In our view, restricting the term "foregoing" to the immediately preceding sentence, as advocated by Landlord, would "prevent the spirit and letter of the terms and provisions of [the] Addendum from being given full force and effect."

As stated above, when interpreting a contract, we must ascertain the intent of the parties and give effect to the plain and unambiguous terms of the contract. From our reading of the entire Quizno's Addendum, we agree with Tenant that the term "foregoing" plainly applies to the entire "Assignment Provisions" paragraph and not simply to the sentence immediately preceding the term.

Based on this interpretation of the term "foregoing," the two renewal options were to automatically transfer to an assignee along with the assignment of the Lease. Therefore, the provision in the Quizno's Addendum permitting Tenant to assign the Lease with the consent of Landlord, not to be unreasonably withheld or delayed, included the two renewal options. Accordingly, we reject Landlord's argument that it was not required to have a reasonable basis for refusing to consent to the inclusion of the two renewal options in Tenant's assignment of the Lease to Mr. Aggarwal.

### Reasonable Basis for Withholding Consent

Under the Quizno's Addendum, Tenant had "the right to assign [the] Lease . . . without charge . . . to a duly authorized franchisee of [Quizno's] <u>with Landlord's consent not to be unreasonably withheld or delayed</u>." (Underlining in original). The trial court below determined that Landlord breached the Lease "when it refused to allow assignment of the two options to extend to the proposed assignee, who was an authorized franchisee of [Quizno's] and who had been financially approved by [Landlord] as an assignee." The clear implication of this holding, in view of the evidence, was that Landlord acted unreasonably when it refused to give Tenant consent to assign the two renewal options to Mr. Aggarwal.

On appeal, Landlord claims that the evidence preponderates against the trial court's finding that it unreasonably withheld its consent to transfer both renewal options to Mr. Aggarwal with the assignment of the Lease. Landlord points out that its obligation to give consent to the assignment in this case was not unfettered, it had only an obligation not to withhold its consent "unreasonably." Landlord applies the definition of "unreasonable" found in Black's Law Dictionary: "arbitrary, capricious, absurd, immoderate, or exorbitant, not comfortable to reason, irrational, beyond the bounds of reason or moderation." Brief of Appellant at p. 11 (citing <u>Black's Law Dictionary</u> 536 (6th ed. 1996)). Under this definition, Landlord argues, the preponderance of the evidence submitted at trial shows that its decision to withhold consent to assign the two five-year renewal options to Mr. Aggarwal was a

-14-

reasonable business decision based on objective factors. Therefore, it was not arbitrary, capricious, or absurd. In support of this argument, Landlord relies in large part on the testimony of Mr. Scarbrough, Landlord's representative, who explained why Landlord withheld its consent to the assignment.

This Court addressed a "reasonable" withholding of consent in this context in *First American Bank of Nashville, N.A. v. Woods*, 781 S.W.2d 588 (Tenn. Ct. App. 1989). In *Woods*, a business entity leased property from the plaintiff lessor for the operation of a fast food restaurant. The defendants, who owned the business entity, were personal guarantors of the business's obligations under the lease. The lease provided that the lessee had the right to assign the lease to another tenant "with the written consent of the Lessor, which shall not be unreasonably withheld."[17] *Woods*, 781 S.W.2d at 589.

Without notifying the lessor or obtaining its consent, the lessee in *Woods* assigned the lease to another business entity. The lessor discovered the assignment and was displeased that it was not first consulted. Subsequently, the defendants sent a belated written request to the lessor for its consent to the assignment of the lease. The lessor refused to consent to the assignment unless the defendants reaffirmed their personal guaranties. The defendants would not agree to continue their guaranties, but the assignment was not rescinded. Therefore, the validity of the assignment and the defendants' personal guaranties remained in dispute. Subsequently, the assignee abandoned the lease. After this, the lessor, the assignee, and the guarantors became embroiled in protracted litigation over the parties' obligations under the lease.[18] *Id.*

Later, the lessor filed a lawsuit against the defendants based on their personal guaranties. The defendants argued that they were not liable under the guaranties, and that the lessor acted unreasonably in conditioning its consent to the assignment on the continuation of the personal guaranties. *Id.* at 590. The lessor argued that its decision to withhold unconditional consent to the assignment was reasonable, because the assignee's financial condition was uncertain, and continuation of the guaranties would have ensured performance under the lease. After a hearing, the trial court determined that the lessor's refusal to assign the lease without a continuation of the personal guaranties was reasonable, and that the defendants remained liable under their guaranties. *Id.*

_____

[17]The contract actually provided that the lessee could sublease the property to another that would "assume full responsibility" for the lessee's obligations under the lease, and that the lessee would be released from all further liability. This type of sublease was treated as an assignment. *See Woods*, 781 S.W.2d at 589-90.

[18]For a detailed discussion of the lawsuits and other dealings between these parties, see *First American Bank of Nashville, N.A. v. Woods*, 734 S.W.2d 622 (Tenn. Ct. App. 1987).

On appeal, the defendants argued that the lessor had unreasonably withheld consent to the assignment under the circumstances. In addressing this issue, the appellate court explained that the provision of the lease requiring that the landlord's consent be "not unreasonably" withheld requires the landlord's actions to be "commercially" reasonable:

> The standard usually applied in determining whether withholding of consent was reasonable is expressed as a reasonable commercial standard. The standard is generally understood to include the elements of "good faith" and "fair dealing." The question is whether the landlord's conduct is that of "a reasonably prudent person ... exercising reasonable commercial responsibility."
>
> A landlord may not withhold consent because of personal whim or taste, or other arbitrary reasons, when the lease provides that consent to an assignment will not be unreasonably withheld. The Trustee had a duty to act in good faith. A primary factor in determining whether a landlord acted in good faith and in a commercially reasonable manner is the "financial responsibility of the proposed subtenant." In considering the proposed assignee's finances, *an analysis should focus on the reasonableness of the landlord's perception that the proposed tenant presented financial or other risks.*
>
> In making a determination of whether to withhold its consent, it is unreasonable for a landlord to take into consideration "personal taste, convenience or sensibility." *The landlord's desire "to extract an economic concession"* or "philosophical or ideological differences with [a] subtenant" *may not be taken into consideration.*
>
> Normally, the standard for determining the reasonableness of consenting or withholding consent under a lease is to make a comparison of the financial stability of the present tenant and/or guarantors as contrasted to the proposed assignee.

*Id.* at 590-91 (citations and quotations omitted; emphasis added). Thus, a landlord cannot withhold consent based on "personal whim, taste, or other arbitrary reasons," or on "convenience or sensibility," or to "extract an economic concession;" rather, in determining whether to consent to the assignment, the landlord must focus on whether the proposed assignee poses "financial or other risks." *Id.* The *Woods* court further recognized that the burden was on the defendant guarantors to prove by a preponderance of the evidence that the lessor acted unreasonably. *Id.* at 591.

Courts addressing a lease provision such as the one at issue here have almost universally found it reasonable for a landlord to withhold consent to an assignment based on objectively legitimate concerns about the prospective assignee's ability to meet the financial requirements of the lease. ***See*** 49 Am. Jur. 2d *Landlord & Tenant* § 942. In contrast, if the landlord refuses to consent to the assignment in order to strike a better bargain or obtain a higher rent from the prospective assignee, this is generally found to be unreasonable:

> Courts are particularly apt to find that a landlord's withholding of consent to an assignment . . . was unreasonable in cases where the only apparent reason for refusal was the landlord's desire to rent directly to the proposed assignee . . . under a new lease at a higher rent. A number of courts have stated that it is not reasonable for a landlord to withhold consent to an assignment . . . solely to extract an economic concession or to improve the landlord's economic position.

69 Am. Jur. Proof of Facts 3d 191 § 19 (Supp. 2011) (footnotes omitted, citing cases).

The trial court below summarized the pertinent portions of Mr. Scarbrough's testimony as follows:

> Scarbrough admitted that [Landlord's] rationale for not assigning both extensions [of the Lease to Mr. Aggarwal] was that it would be a bad business decision and not a good deal for [Landlord]. He testified [Landlord] could have granted the second option if [Landlord] had wanted to, but did not want to. Basically, he testified that [Landlord] wanted Aggarwal "locked-in" for ten years and that under the two [Lease renewal] option transfer, Aggarwal would have the option not to stay and [Landlord] wanted to keep the negotiating power in it's [sic] hands.

From our review of the record, this summary is well supported by the evidence at trial. It is apparent from the email exchanges and the testimony of Mr. Scarbrough that the primary basis for Landlord's unwillingness to allow Tenant to assign Mr. Aggarwal the existing Lease with the two renewal options was that it would not behoove Landlord to have a tenant for only ten months without a longer commitment. In his words, it was "bad business." Instead, Landlord thought it was a better for Landlord's business to lock Mr. Aggarwal into the Lease for seventy months (ten months plus the first renewal period) and then give him only one option to renew, which would ensure that Landlord's property was leased for *at least* five years under the new management. Had Landlord simply consented to the assignment of the Lease and the two renewal options, unchanged, the negotiating power would have been tilted in favor of Mr. Aggarwal. As was explained in ***Woods***, however, a

contract term giving Landlord the right to withhold consent on a reasonable basis does not provide Landlord with an opportunity to force the assignee into renegotiating the terms of the Lease or to extract an economic concession from the assignee. Nor was Landlord permitted to withhold consent based on personal whim or taste, or on the perception that the assignee was "difficult" to work with on a personal level. According to the standard in *Woods* and other caselaw, these are not "reasonable" bases for Landlord to withhold consent to an assignment of the Lease.

Mr. Scarbrough also indicated that Landlord withheld consent based on some unspecified "uncertainty" about Mr. Aggarwal's financial stability. However, the trial court apparently discredited this testimony and credited the other evidence suggesting that Landlord found Mr. Aggarwal to be satisfactory from a financial perspective. Indeed, the fact that Landlord wanted to lock Mr. Aggarwal into the Lease for a longer period time is evidence that it deemed him to be financially stable.[19] Thus, we find that the evidence preponderates in favor of the trial court's finding that Landlord breached the Lease when it withheld its consent to the assignment of the Lease and the two renewal options.

### Waiver Based on Doctrine of Merger

Landlord next argues that Tenant waived any claim that it breached the Lease by entering into the second sale agreement with Mr. Aggarwal and by executing the September 25, 2007 Assignment. This argument appears to be based on the doctrine of merger, under which "the last agreement concerning the same subject matter that has been signed by all parties supersedes all former agreements, and the last contract is the one that embodies the true agreement." *Magnolia Group v. Metro. Dev. & Hous. Agency of Nashville*, 783 S.W.2d 563, 566 (Tenn. Ct. App. 1989) (citing *Bringhurst v. Tual*, 598 S.W.2d 620 (Tenn. Ct. App. 1980)). Landlord notes that the September 25, 2007 Assignment, assigning the Lease and the first renewal option to Mr. Aggarwal, states: "The Second [renewal] Option is NOT transferable." Landlord contends that, because the Assignment was the last agreement concerning the renewal options for this property, it embodies the parties' "true agreement," and it either precludes the transfer of the second option under the new language or modifies the original Lease to that effect.

The merger doctrine is well-established in Tennessee; the doctrine puts structure to ascertaining the parties' intent where there are successive agreements. *See Dunn v. United Sierra Corp.*, 612 S.W.2d 470, 474 (Tenn. Ct. App. 1980); 17A Am. Jur. 2d *Contracts* § 539 (2011). Synthesizing the holdings in Tennessee caselaw, the merger doctrine has been

---

[19]One July 14, 2007 email from Mr. Aggarwal to Mr. Sterling recounted Mr. Sterling's comment to Mr. Aggarwal that he did not "care even if [the assignee] is Bill Gates."

summarized as follows: "Under the doctrine of merger, parties to a contract may enter into a subsequent agreement concerning the same subject matter as the prior one; the earlier contract . . . merges into the latter contract, and is rescinded or extinguished." Stephen W. Feldman, 22 Tenn. Prac. Series, *Contract Law and Practice* § 10.11 (2011) (citing cases). For merger to apply, the successive contracts must have the same parties, and they generally "must contain inconsistent terms such that they cannot stand together as supplemental agreements." ***Id.***; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 279 (Supp. 2011). Under these circumstances, the "subsequent contract then stands as the only contract between parties." ***M&M Props. v. Maples***, No. 03A01-9705-CH-00171, 1998 WL 29974, at *10 (Tenn. Ct. App. Jan. 12, 1998).

The doctrine of merger is inapplicable to the facts of this case. First, the plain language of the Assignment indicates that the parties to the Assignment did not intend for the Lease to "merge into" the Assignment, as the Assignment itself states that the "Lease is valid and existing." In addition, the subject matter addressed in the Lease is separate and apart from the Assignment. The Assignment is what the title suggests, that is, an assignment of the original Lease to a successor tenant, Mr. Aggarwal; thus the Lease and the Assignment "stand together as supplemental agreements." 22 Tenn. Prac. § 10.11. For these reasons, we find that the doctrine of merger is inapplicable. Accordingly, we find no waiver of Tenant's breach of contract claim based on the merger doctrine.

This holding pretermits the issue of whether the trial court erred in finding that Tenant entered into the September 2007 Assignment based upon the economic duress imposed by Landlord on Tenant in attempting to force a new contract.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Broadmoor Investment Corporation and its surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE