# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 17, 2013 Session

## 1963 JACKSON, INC., ET AL. v. LLOYD DE VOS, ET AL.

**Direct Appeal from the Chancery Court for Madison County**
No. 67109    James F. Butler, Judge

---

**No. W2012-02212-COA-R3-CV - Filed November 21, 2013**

---

This appeal arises from Lessee's rental and operation of a hotel owned by Lessor. Lessee sought Lessor's consent to an assignment of the lease to a third party. Not only did Lessor withhold consent to the assignment, Lessor terminated the lease based on conditions at the hotel that he deemed to violate the lease. Lessee sued alleging that Lessor wrongfully terminated the lease and unreasonably withheld consent to the assignment. The trial court determined that Lessee had not breached the lease and that Lessor unreasonably withheld consent to the assignment. The trial court awarded Lessee $150,000 in damages for Lessor's unreasonable withholding of consent to the assignment. Lessor appeals. We affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part, Reversed in part and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Cannon F. Allen and J. Bennett Fox, Jr., Memphis, Tennessee, for the appellant, Lloyd De Vos, Co-Trustee of the Isaac Burton Tigrett, II Trust and August King Tigrett Trust.

Charles H. Barnett, III and Sara E. Barnett, Jackson, Tennessee, for the appellees, 1963 Jackson, Inc., and Morgan Group, Inc.

## OPINION

### I. BACKGROUND AND PROCEDURAL HISTORY

In 1967, Francis Tigrett and Holiday Inns of America, Inc. ("Holiday Inn") entered into a ground lease (the "Lease") for a tract of land located at 1963 U.S. Highway 45 Bypass

in Jackson, Tennessee. Pursuant to the Lease, Holiday Inn was to construct, furnish, and operate a hotel on the property (the "Hotel"), while making monthly rent payments to Tigrett. The Lease stated that rent would be calculated as 3% of the annual gross room rentals or a base monthly rent of $700, whichever was greater. Originally, the Lease provided that the Hotel would be operated in accordance with Holiday Inn standards and would maintain operation of a restaurant and lounge. In 1985, the Lease was modified to delete some of the requisite operating standards and increase the base monthly rent to $4,350. As modified, the Lease provides that the land is to be used for "any hotel or motel use." Additionally, the Hotel is no longer required to operate the restaurant and lounge, as those provisions were also removed. Of particular relevance to this case, section 5.01 of the Lease states that at its own expense, the lessee must maintain the motel in accordance with the minimum standards of its national franchisor, provided, however, that the lessee will not be required to spend over 5% of the gross annual guest room rentals on maintenance, repairs, and replacements ("MRR") in any one year (the "5% cap").[1]

In 1967, Holiday Inn constructed the original 150 room Hotel on the land. In 1973, the construction of an annex building expanded the Hotel to its current size of 205 rooms. Over the years, the Hotel has had several different tenants and operated under various corporate flags. During the times relevant to this litigation, the Hotel was being operated as an EconoLodge. When Francis Tigrett passed away in 2002, she placed the Hotel into trusts for her son, Isaac Tigrett, II, and his daughter, Augusta King Tigrett. In 2005, Lloyd De Vos ("De Vos") became the trustee of the trusts. In his capacity as trustee, De Vos has since acted as the landlord/lessor of the Hotel.

In 2004, the Lease was assumed by Akshar Jackson, LLC ("Akshar Jackson"). San Diego National Bank ("SDNB") financed Akshar Jackson's leasehold mortgage. Akshar Jackson operated the Hotel for the next five years. As the economy worsened in 2008 and

---

[1]In its entirety, section 5.01 of the Lease states:

> The Lessee shall, at its own expense, maintain and repair the demised premises and whenever necessary replace the furnishings and equipment and in addition shall at its own expense maintain the said motel and restaurant in a manner in accordance with the minimum standards from time to time prevailing during the currency of this lease or any renewal period hereof, which apply for the furnishings, equipment, maintenance, and repair of motels and restaurants forming part of the national chain of motels which are owned by Lessee or franchised by Lessee for operation by others, provided, however, that these provisions shall not be construed so as to require the Lessee to expend on maintenance, repairs and replacements to real and personal property in any one (1) year an amount in excess of five percent (5%) of the gross annual guest room rentals less exceptions and exclusions as defined and set out in Article 3, Section 3.01 (A), hereof.

2009, Akshar Jackson apparently struggled to maintain the Hotel and make mortgage payments to SDNB. In May 2009, SDNB foreclosed on the mortgage and assumed the Lease. Upon assuming the Lease obligations from Akshar Jackson, SDNB formed a subsidiary, 1963 Jackson, Inc. ("1963 Jackson"), to take ownership of the Lease. In May 2009, 1963 Jackson took legal title to the Lease and stepped into its role as tenant/lessee of the Hotel.

Having no experience in hotel operations, 1963 Jackson immediately hired Ocean Hospitality, a hotel management company, to operate the Hotel on its behalf. Ocean Hospitality employee Robert Greene ("Greene") was charged with taking control of the Hotel. When he first arrived at the Hotel in May 2009, Greene observed that the Hotel appeared to be in poor condition and suffered from a great deal of deferred maintenance issues. Greene recommended that renovating the exterior of the Hotel first would improve its visibility and help repair its reputation. In May 2009, 1963 Jackson immediately began investing money into the Hotel. By the end of 2009, 1963 Jackson spent $272,659 on MRR and improvement of the Hotel. Additionally, 1963 Jackson met its rent obligation under the lease, paying $4,350 to the trusts each month.

In October 2009, SDNB went into receivership and U.S. Bank purchased substantially all of its assets, including all stock in 1963 Jackson. After acquiring 1963 Jackson and its interest in the Lease, U.S. Bank immediately started looking for potential purchasers for the leasehold interest. In February 2010, U.S. Bank and 1963 Jackson entered into an agreement with Morgan Group, Inc. (the "Morgan Group") to assign the Lease for $850,000. Pursuant to section 13.08 of the Lease, the assignment of the Lease required the lessor's written consent, which could not to be unreasonably withheld or delayed. The agreement required De Vos's approval to be complete.

On March 2, 2010, 1963 Jackson notified De Vos of its contract with the Morgan Group and requested that he advise what further information would be needed to consider the request. For the next three months, the parties communicated frequently regarding the proposed assignment. On March 5, noting that the Morgan Group was a shell corporation with no assets, De Vos requested financial information of its shareholders so that he could ascertain whether they had the financial capability to meet the terms of the Lease. On March 11, the Morgan Group sent De Vos the requested financial information of its two shareholders, Dr. Rajesh Aggarwal ("Aggarwal") and Manish Kharat ("Kharat"). The financial statements showed that Aggarwal had a net worth of over $27 million and Kharat had a net worth of about $800,000. The statements also showed that Aggarwal had around $1.3 million in liquid assets, which he could readily convert to cash to finance the sale. De Vos replied on March 26, requesting, among other things, a personal guarantee of amounts due under the Lease and information regarding the shareholders' experience in hotel

management. On the same day, De Vos sent a letter to 1963 Jackson claiming that 1963 Jackson had breached the Lease and giving notice of default ("Notice Letter").

In the Notice Letter, De Vos indicated that the condition of the Hotel violated the Lease in several respects. In pertinent part, the Notice Letter stated:

> At the time that this lease was entered into, it was contemplated by the parties thereto that this property would be operated as a first rate motel property by one of the leading operators of motel properties in the United States. The lease rental structure consisting of a percentage lease with a minimum rental was entered into with that clearly in mind. At the present time, the property is being operated as a $49.99 per night low end motel. More than ten percent of the rooms of this property are unfit for rental as motel units. The occupancy rate is hovering around twenty-five percent (25%). The furniture in the rooms with the exception of the bed and, in some rooms, the television set, has not been replaced since the property was originally furnished at the time of its construction in the late 1960's.

> Section 5.01 of the lease provides that "Lessee shall, at its own expense, maintain and repair the demised premises and whenever necessary, replace the furnishings and equipment." The Lessee has failed to do so.

> . . . .

> Under the terms of the lease, a default will occur if the condition complained of is not remedied within sixty days from receipt of this notice. We look forward to the replacement of the furniture, the re-opening of the restaurant and lounge, the repair of un-rentable rooms and the general upgrading of the property to the point where the property can command room rates and occupancy levels comparable to the Holiday Inn.

1963 Jackson responded to the Notice Letter on May 6, insisting that it was in full compliance with the Lease. The response pointed out that several of the Lease provisions that De Vos relied on in alleging default had been deleted when the Lease was modified in 1985. For instance, though the Hotel was originally intended to operate in accordance with Holiday Inn standards, after the 1985 Lease modification, the premises was designated for "any hotel or motel use." Additionally, the 1985 modification deleted any requirement that the Hotel maintain operation of a restaurant and lounge. 1963 Jackson pointed out that it had far exceeded its obligation under the Lease's 5% cap to pay for MRR, furniture, and equipment. 1963 Jackson showed that in 2009, it spent over 29% of the gross annual room

-4-

rentals on MRR expenditures. Finally, 1963 Jackson again requested that De Vos expediently provide written consent to its assignment of the Lease to the Morgan Group.

Believing that the Hotel's condition did not constitute a breach of the Lease, the Morgan Group continued to discuss the proposed assignment with De Vos. On May 5, after a failed attempt to purchase the property outright, the Morgan Group responded to De Vos's March 26 letter. Notably, the letter expressed Aggarwal's and Kharat's willingness to personally guarantee the Morgan Group's obligations under the Lease and outlined their extensive experience in hotel operations and management. The letter also expressed the Morgan Group's willingness to upgrade the property consistent with the Lease's 5% cap on MRR expenditures.

Despite the Morgan Group's efforts, De Vos remained reluctant to give his consent to the assignment. On May 11, De Vos emailed the Morgan Group expressing concern that Aggarwal's $1.3 million in liquid assets would be an insufficient cushion to meet the Lease obligations in the event of an economic downturn. Among other things, De Vos requested specific plans, budgets, timetables, and alternate sources of cash for upgrading the property. At that point, discussions between the sides became strained. On May 12, the Morgan Group responded, stating that De Vos's continued requests were "annoying." On the same day, Kharat sent De Vos a lengthy email expressing his frustration with De Vos's "unrealistic" requests. After May 12, the parties made little further progress toward an agreement.

At trial, evidence of De Vos's other activities during the spring of 2010 provided a possible explanation for his reluctance to consent to the assignment. In 2009, Isaac Burton Tigrett, II had expressed to De Vos his willingness to liquidate his properties in Jackson, including the Hotel. In late 2009, De Vos began negotiating with another hotel management group, the Mehta Group, to sell the Hotel. De Vos negotiated with the Mehta Group through a series of emails with its attorney, Ed Wallis, and was able to solicit an offer of $1.6 million in March 2010. However, the Mehta Group's offer was contingent on also acquiring the leasehold interest. On March 10, Wallis explicitly told De Vos via email that the Mehta Group would like to see the proposed assignment of the Lease from 1963 Jackson to the Morgan Group fall through and the Lease terminated. Shortly thereafter, on March 26, De Vos sent the Notice Letter to 1963 Jackson stating that the condition of the Hotel was not in compliance with the Lease and warning that default would occur if the conditions complained of were not remedied within sixty days.

Though 1963 Jackson vigorously disputed De Vos's assertion that the condition of the Hotel was not in compliance with the Lease, on May 31, De Vos sent a letter to 1963 Jackson to inform it that the Lease was terminated (the "Termination Letter"). The Termination Letter reiterated the conditions that had been specified in the Notice Letter and noted that

they had not been remedied, stating:

> The (Notice Letter) pointed out the neglect of the property. It appears that approximately 10% of the rooms are un-rentable due to active and passive waste committed on the property and poor maintenance. The guest rooms are generally worn, dusty, dated, and tired. The furniture and drapes are in poor condition and, in some areas of the hotel, have been removed or are broken. The restaurant and lounge, as you concede, are now closed. The equipment is [sic] very poor condition and is not fully functioning. The occupancy rate is low. Room rates have deteriorated. The facility is currently being operated as an EconoLodge although the prior consent to assignment contemplated that it would be operated as a Comfort Inn. The general decline of the property necessitates that the facility be operated as a low-end motel.

Though the Notice Letter did not mention the annex building, the Termination Letter went on to state:

> The Annex building, as you know or should know, is in a dismal and unsecured condition. The fourth floor rooms have been actively wasted. Furniture, fixtures and equipment have been cannibalized and removed or are damaged and dilapidated. The mattresses that remain have not been protected from deterioration. The carpet is torn. The sinks and toilets are in bad condition or have been removed. We understand that the preceding lessee used the fourth floor of the Annex building as a residence and left the premises in a dismal and wasted condition. The key locks are defective and broken, and rooms are simply open to strangers. The facility is not only unsecure, it is apparently unmonitored. Guests and strangers to the property have ready access to the second, third and fourth floors by stair and elevator. These rooms are not typically rented or maintained. Fire exits have been blocked with trash and are not secure. Further inspection revealed a large sink hole at the back of the property that is not marked and has not been remedied.
>
> . . . .
>
> When we inspected the premises recently, the lobby and hallway of the main building was permeated by a pungent and overwhelming musty [sic] associated with the breaking of a water pipe in Room 119 in the main building, which caused flooding in that room and out into the hallway. The carpet was soaked and the smell was unavoidable. That damage had not been repaired at the time of our visit on May 23, 2010.

De Vos also dismissed 1963 Jackson's contention that it was not in default because it had exceeded the 5% cap on MRR expenditures. He asserted in the Termination Letter that the 5% cap only applied to ordinary wear and tear, not active waste. In light of the alleged breaches, De Vos demanded that 1963 Jackson vacate the premises within seven days. Finally, De Vos noted that because the Lease was terminated, 1963's Jackson's request that the Lease be assigned to the Morgan Group was moot. De Vos wrote, "The Lessor . . . declines to approve the assignment of the now-terminated Lease to yet another person who will allow the premises to continue to deteriorate."

Rather than vacate the premise as the Termination Letter demanded, 1963 Jackson filed a complaint in Madison County Chancery Court seeking a declaration that it was not in violation of the Lease, and seeking damages from De Vos for his breach of the Lease and intentional interference with a business relationship. De Vos counterclaimed for damages contending that 1963 Jackson was not in compliance with the Lease on the termination date. In the meantime, 1963 Jackson continued to operate and make improvements to the property, spending $143,902.86 on MRR between June and September 2010. Pending resolution of this litigation, 1963 Jackson has continued to make rental payments to De Vos.

After a bench trial, the trial court ruled in favor 1963 Jackson, concluding that it had not breached the Lease on any of the claims raised by De Vos. Additionally, the trial court concluded that De Vos unreasonably withheld his consent to the assignment of the Lease to the Morgan Group and awarded 1963 Jackson $150,000 in damages for that breach of his obligation under the Lease. De Vos timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

De Vos presents the following issues for our review, slightly restated:

1.    Whether the trial court erred by determining that the Lease had not been breached.

2.    Whether the trial court erred by finding that 1963 Jackson was not notified of "waste" as an event of default.

3.    Whether the trial court erred by ruling that De Vos unreasonably withheld consent to 1963 Jackson's assignment of the Lease.

4.    Whether the trial court erred by excluding evidence that 1963 Jackson breached the Lease by its failure to obtain insurance.

5.     Whether the trial court erred by awarding compensatory damages to 1963 Jackson.

## III. STANDARD OF REVIEW

On appeal, we review the trial court's findings of fact in a bench trial *de novo*, according them a presumption of correctness. Tenn. R. App. P. 13(d); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Thus, we will not disturb the trial court's findings of fact unless the preponderance of the evidence weighs against it. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). However, we review the trial court's resolution of legal questions *de novo*, without attaching any presumption of correctness to them. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

## IV. DISCUSSION

### A. Default

In the Termination Letter, De Vos listed several conditions at the Hotel as breaches of the Lease, each of which was deemed insufficient by the trial court. On appeal, De Vos only contends that the trial court erred with respect to two of the claimed breaches. First, De Vos argues that the trial court erred by finding that 1963 Jackson did not commit waste on the premises. Second, De Vos argues that the trial court erred by finding that 1963 Jackson did not violate its duty to fully furnish and equip the Hotel as provided in the Lease. We will address each of the arguments in turn.

### Waste

In the Termination Letter to 1963 Jackson, De Vos specified waste as one of the conditions present in violation of the Lease. Pursuant to Article 8 of the Lease, 1963 Jackson covenants not to commit or permit any waste on the premises. The parties do not dispute that waste, if present, would be grounds for termination of the Lease. However, the term "waste" is not defined in the Lease. The trial court heard a great deal of testimony regarding the condition of the Hotel and whether or not its condition constituted waste. After considering all of the evidence presented, the trial court determined that waste was not proven at trial and there was no breach of the Lease on those grounds. De Vos contends that the preponderance of the evidence does not support the trial court's finding.

We begin by clarifying the boundaries of our inquiry. De Vos contends that the trial court ignored the fact that 1963 Jackson assumed all obligations of the Lease when it took over for the prior tenant, Akshar Jackson. At the time 1963 Jackson assumed the Lease, it

did not seek assurance from De Vos that the Hotel was in compliance with the Lease. De Vos contends that 1963 Jackson, though it improved the property, may be liable for uncured waste caused by Akshar Jackson. Though it is not clear from the record that the trial court declined to hold 1963 Jackson liable for waste of the prior tenant, we agree with De Vos's assertion. It is well settled that the assignee of a lease steps into the shoes of the assignor and is liable on all covenants in the lease that run with the land. *Brummitt Tire Co. v. Sinclair Refining Co.*, 75 S.W.2d 1022, 1028 (Tenn. Ct. App. 1934). If waste existed on the property on the date of the Termination Letter, it does not matter whether it was caused by 1963 Jackson or Akshar Jackson.

Additionally, De Vos argues that 1963 Jackson cannot be credited with curing waste by making repairs after the Termination Letter. Again, it is not clear that the trial court credited 1963 Jackson with curing waste after the Termination Letter. In any event, we agree with De Vos's contention that the relevant inquiry is whether waste existed on the premises on May 31, 2010, regardless of which tenant caused the waste and what repairs were subsequently made.

At trial and in their briefs, the parties note the importance of distinguishing between MRR and waste. The importance of distinguishing the two comes from the provisions of the Lease itself. Section 5.01 of the Lease provides a 5% cap on MRR expenditures, however it is undisputed that the 5% cap does not apply to the lessee's expenditures to cure waste on the premises. The problem is that a failure to make small repairs or address ordinary wear and tear (MRR) can constitute waste over time. *State v. Delinquent Taxpayers*, No. M2004-00951-COA-R3-CV, 2006 WL 3147060, at *7 (Tenn. Ct. App. Mar. 16, 2006). De Vos argues that if the number of repair items reaches a level of waste, 1963 Jackson cannot use the Lease's 5% cap on MRR expenditures as a shield against liability for that waste. Again, we agree with De Vos. If, on May 31, 2010, unaddressed MRR conditions on the premises reached a level of waste, the 5% cap is irrelevant and cannot shield 1963 Jackson from liability.

As we noted above, waste is not defined in the Lease. The Tennessee Supreme Court has defined waste as "an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession, which results in substantial injury." *Chapman Drug Co. v. Chapman*, 341 S.W.2d 392, 396 (Tenn. 1960). In Tennessee, waste also requires that the property suffers lasting damage or depreciation in value. *Thompson v. Thompson*, 332 S.W.2d 221, 227 (Tenn. 1960). Actions of the possessor that may constitute waste include changes to the property, changes in the use of the land, and changes in the character of the land where those changes result in permanent injury. *Doramus v. Rogers Group, Inc.*, No. M1998-00918-COA-R3-CV, 2001 WL 196974, at *10 (Tenn. Ct. App. Feb. 28, 2001). Though successive interest holders find a change in the land

objectionable, it is not considered waste unless it results in lasting damage to the remainder or depreciation in value. *Id.* (citing *Barber v. Westmoreland*, 601 S.W.2d 712, 716 (Tenn. Ct. App. 1980)). In *State v. Delinquent Taxpayers*, this Court interpreted waste as such:

> "[W]aste" connotes unreasonable conduct by a person in rightful possession of real property that results in the destruction or permanent physical damage of the property and in substantial diminution in the value of other persons' interests in the property. Waste can be caused either by acts of commission or acts of omission. Thus, "voluntary waste" results from deliberate, affirmative acts by the possessor of property. On the other hand, "permissive waste" results from the failure of the possessor of property to exercise the reasonable care to preserve and protect the future estate or interest of another.
>
> Whether particular conduct amounts to permissive waste depends on the facts and circumstances of the case. The question of what constitutes permissive waste is a question of law; while the question of whether permissive waste has been committed is a question of fact.
>
> Normal wear and tear is not considered to be permissive waste. However, barring a statute or contractual obligation to the contrary, the possessor of property must keep the property in the same general condition that it was at the time of possession. Thus, persons in possession of real property commit permissive waste if they allow a structure to deteriorate for lack of repair.
>
> Historically, the possessors of property have been required to keep the premises wind tight and air tight. While they are required to stabilize a dilapidated structure to prevent further deterioration, they are not required to renovate it. Accordingly, the courts have concluded that the failure to make roof repairs, the failure to replace a furnace to prevent damage from freezing, the failure to paint the exterior of a structure, and the failure to replace or maintain gutters amounts to permissive waste.

*Delinquent Taxpayers*, 2006 WL 3147060, at *7-8 (internal citations and footnotes omitted).

Though our inquiry is restricted to determining whether there were conditions constituting waste at the Hotel on May 31, 2010, we are unable to travel back in time and inspect it ourselves. Instead we must rely on the testimony and exhibits in the record. Though our inquiry into the Hotel's condition is restricted to the termination date, accounts of the Hotel's condition in the weeks before and after the termination date are relevant as circumstantial evidence of its condition on that date.

-10-

In mid-March 2010, Isaac Tigrett, II visited the Hotel. Tigrett testified that upon his visit, 1963 Jackson had made tremendous improvements to the kitchen and pool areas, but that the fourth floor of the annex building was unrentable. Most of the fourth floor rooms in the annex building did not have locks and there was broken glass on the floors. Furniture from the fourth floor rooms had been removed and put in rentable rooms on other floors. Tigrett testified that some of the rooms did not have sinks or toilets and they smelled "terrible."

In the Termination Letter, De Vos indicates one of his representatives visited the Hotel on May 23, 2010, and that on that date there was an unmarked sinkhole on the property and a broken water pipe in one of the first floor rooms. It is unclear how long the sinkhole had existed on the property, though there is evidence indicating that it was the result of heavy rains in Jackson in May 2010. Daniel Hays, an employee of Ocean Hospitality, testified that the sinkhole was quickly remedied without causing any problems. Hays also testified that the broken pipe occurred at the end of May 2010 and was repaired prior to his arrival at the Hotel on June 6, 2010.

An SDNB report dated May 31, 2010 shows that sixty-two of the Hotel's rooms were out of service on that date. Rooms on the fourth floor had been stripped of furniture, locks, and faucet handles. De Vos argues that the Hotel's low room rates and occupancy rates are further indicators of waste. At the time of the Termination Letter, the occupancy rate of the Hotel was around 20%. Upon receipt of the Termination Letter, 1963 Jackson spent over $100,000 and brought furniture and fixtures to the Hotel from a hotel property in Memphis in an attempt to remedy the conditions De Vos complained of. Post-termination repairs were made to approximately eighty rooms. De Vos contends that by those actions, 1963 Jackson essentially conceded that there was waste on the property.

Conversely, 1963 Jackson contends that the Hotel was not subjected to waste on May 31, 2010. 1963 Jackson admits that some of the rooms were unrentable and needed repair on that date, but claims that those conditions were commercially reasonable hotel operation rather than waste. 1963 Jackson supports its claim with testimony from professionals in the hotel operations industry. Robert Greene managed the Hotel for Ocean Hospitality and has over thirty years of experience in hotel management. Greene testified that he made the business decision not to make the fourth floor available for occupancy because there was no demand for them. David Akridge was formerly employed by Ocean Hospitality and has been in the hotel operations business for thirty-four years. Akridge testified that the Hotel always passed EconoLodge's quality assurance inspections. Akridge also testified that in his opinion the Hotel was not subject to any unreasonable abuse. Akridge indicated that the low occupancy levels of the Hotel were the result of economic times and a lack of demand for hotel rooms in Jackson as a whole, rather than waste. Dr. Rajesh Aggarwal has owned hotels

since 1994 and is currently operating the Hotel. Aggarwal testified that when he toured the Hotel in February 2010, he did not see anything commercially unreasonable about the way it was being operated. Drew Dimond has been a hotel consultant for twenty-five years. Dimond testified that 1963 Jackson's decision to take rooms out of service and strip them down was commercially and economically reasonable because there was no demand for them. Dimond testified that even five-star hotels routinely take rooms out of service and strip them. Additionally, Dimond noted that because the Hotel has 205 rooms, comparing its occupancy rate to other hotels in the area, which are much smaller, can be misleading. In fact, the Hotel, though it had a much lower occupancy rate, actually filled more rooms per night than its direct competitors in the area in 2009 and 2010.[2] Daniel Hays is a general manager with Ocean Hospitality and has been in the hotel business for twenty-eight years. Hays arrived at the Hotel on June 6, 2010, one week after De Vos sent the Termination Letter. Hays testified that the Hotel was well maintained on his arrival. He further testified that it was not reasonable to keep the rooms of the fourth floor of the annex building rentable because there was no demand for them.

After viewing the testimony and evidence at trial, the trial court concluded that there was no breach of the Lease based on waste. After reviewing the record, we concur. A finding of waste requires that there be "an unreasonable or improper use, abuse, mismanagement" on the part of the lessee. *Chapman Drug Co.*, 341 S.W.2d at 396. Multiple witnesses in this case testified that the Hotel's condition did not rise to the level of waste. Each of the hotel management professionals that testified indicated that it was not commercially reasonable for 1963 Jackson to keep all of its rooms furnished and rentable when there was no demand for them. No testimony was presented to challenge that assertion. Based on the foregoing, we think that De Vos has failed to show by a preponderance of the evidence that the Hotel was subjected to "unreasonable or improper use, abuse, or mismanagement." We affirm the conclusion of the trial court that the Hotel was not subjected to waste at the time of the Termination Letter.

### *Fully Furnish and Equip*

De Vos argues that the trial court erred by concluding that 1963 Jackson did not breach the Lease provision requiring the lessee to "fully furnish, and equip" the Hotel. Article 1 of the Lease provides that the lessee (originally Holiday Inn) will construct a 150 room hotel on the premises. Additionally, "[l]essee will further fully furnish, and equip at

---

[2]Dimond was employed by 1963 Jackson to determine whether there had been waste on the property. As part of his report, he compared the Hotel to "similar" hotels in Jackson, which he considered to be the Hotel's direct competitors. The hotels in the "competitive set" were the Super 8, Days Inn, Guest House Inn, and Motel 6 located in Jackson.

its own expense said motel. . . ." De Vos contends that this provision requires that each room in the Hotel be furnished at all times in order to avoid breach by the lessee.

This issue is one of contract interpretation. De Vos argues that 1963 Jackson's duty to fully furnish and equip the Hotel requires that each room remain fully furnished and rentable at all times. He contends that 1963 Jackson's practice of leaving over sixty rooms unrentable rises to the level of a material breach of the Lease provision. Conversely, 1963 Jackson relies on the expert testimony of hotel management professionals that leaving rooms unrentable is commercially reasonable and commonplace in the industry. 1963 Jackson contends that the parties to the Lease obviously did not intend to limit the lessee's flexibility to efficiently operate the Hotel. The trial court agreed with 1963 Jackson. The trial court found that in a 205 room hotel with a 20-40% occupancy rate, De Vos's interpretation of the Lease, requiring all rooms to be rentable at all times, was unreasonable. De Vos contends that in making its finding, the trial court ignored the plain language of the Lease.

A lease is a contract and should be governed by the general contract principles of good faith and commercial reasonableness. *Dick Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 664 n.6 (Tenn. 2013) (citation omitted). When interpreting a contract, courts must always be careful to give a reasonable and equitable construction. *Hathaway v. Hathaway*, 98 S.W.3d 675, 679 (Tenn. Ct. App. 2002). "[I]t is well settled that '[a] qualifying word which must be read into every contract is the word 'reasonable' or its equivalent 'reasonably.''" *Id.* at 678-79 (quoting *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993). Thus, the extent of parties' obligations under a contract should be tempered by a reasonableness standard. *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1990).

Article 1 of the Lease requires the lessee to construct a 150 room hotel on the premises and fully furnish and equip it. There is, however, no further provision that the rooms must remain fully furnished or rentable at all times thereafter. De Vos contends that without implying such a covenant, the lessee could have furnished the Hotel, then stripped it of all furniture and fixtures with no recourse to the lessor. However, such action by the lessee would violate section 5.02 of the Lease, which requires the premises to be maintained for "any hotel or motel use." Read in conjunction with section 5.02 of the Lease, Article 1 requires that the Hotel be fully furnished and equipped for reasonable hotel or motel use. As noted above, numerous expert witnesses testified that keeping all 205 rooms in the Hotel rentable at all times was not commercially or economically reasonable. We are unpersuaded by De Vos's argument that the original parties to the Lease intended to bind the lessee to unreasonable commercial standards in operating the Hotel. Based on the foregoing, we affirm the trial court's conclusion that 1963 Jackson did not breach the Lease by failing to fully furnish and equip the Hotel.

### B. Notice

In addition to finding that 1963 Jackson did not permit waste at the Hotel, the trial court found that the Notice Letter De Vos sent to 1963 Jackson on March 26, 2010 did not properly put 1963 Jackson on notice that waste was a condition of default being alleged. The Lease provides strict procedures that must be followed for termination of the Lease based on default. First, section 15.01(B) requires the lessor to give the lessee notice of the alleged breach. Upon receiving the lessor's notice, the lessee has sixty days to cure the breached condition. If the lessee does not cure the breach within sixty days, the lessor may terminate the Lease by sending written notice that the Lease is being terminated. If the lessor does not terminate the Lease within six months after the notice of default is given, the notice of default becomes void and must be given again.

The dispositive question here is whether the Notice Letter sent on March 26, 2010 put 1963 Jackson on notice that waste was an alleged event of default. The trial court found that it did not. The trial court found that De Vos did not give notice that waste was an event of default until the Termination Letter. The trial court concluded that because there was no subsequent termination of the Lease based on waste within six months of the May 31, 2010 Termination Letter, that notice was void. Thus, even if the condition of the Hotel did constitute waste on May 31, 2010, there was no termination of the Lease for waste because the termination procedures of the Lease were not followed.

De Vos contends that the Notice Letter did put 1963 Jackson on notice that waste was an event of default. He argues that although the Notice Letter never specifically used the word "waste," any reasonable person reading it would have understood it to be a complaint of waste on the property. De Vos argues that the trial court essentially penalized him for being too specific in the Notice Letter. He contends that because the Notice Letter put 1963 Jackson on notice that waste was an event of default, the Termination Letter properly terminated the Lease.

The question before the Court is whether the Notice Letter was legally sufficient to permit forfeiture of the Lease. Though forfeiture of a contract will be enforced where equity demands it, the law does not favor forfeitures and they are strictly construed by this Court. *Simmons v. Hitt*, 546 S.W.2d 587, 591 (Tenn. Ct. App. 1976). "Before a court will enforce a forfeiture, there must be clear proof of the right to the forfeiture and the grounds on which the forfeiture is allowed must be well established." *Hooten v. Nacarato GMC Truck, Inc.*, 772 S.W.2d 41, 46 (Tenn. Ct. App. 1989). All reasonable presumptions are against forfeiture and the person seeking to enforce the forfeiture. *Id.*

Neither party disputes that a condition or event cannot serve as grounds for

termination of the Lease unless it is included in the notice of default. Additionally, it is undisputed that the word "waste" does not appear anywhere in the Notice Letter. De Vos contends that any reasonable person reading the Notice Letter would understand it to be a complaint of waste. We do not believe that to be the case.

As we discussed in more detail above, the Tennessee Supreme Court has defined waste as "an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession, which results in substantial injury." *Chapman Drug Co. v. Chapman*, 341 S.W.2d 392, 396 (Tenn. 1960) (quoting *Thayer v. Shorey*, 191 N.E. 435, 437 (Mass. 1934)). The tenant's improper action or inaction must result in some lasting damage to the property or depreciation in its value. *Thompson v. Thompson*, 332 S.W.2d 221, 227 (Tenn. 1960).

> In pertinent part, the Notice Letter stated:
> At the present time, the property is being operated as a $49.95 per night low end motel. More than ten percent of the rooms of this property are unfit for rental as motel units. The occupancy rate is hovering around twenty-five percent (25%). The furniture in the rooms, with the exception of the bed and, in some rooms, the television set, has not been replaced since the property was originally furnished at the time of its construction in the late 1960's.
>
> Section 5.01 of the lease provides that "Lessee shall, at his own expense, maintain and repair the demised premises and whenever necessary, replace the furnishings and equipment." The Lessee has failed to do so.
>
> . . . .
>
> . . . . The property now has no restaurant and lounge which were contemplated by the lease.

Contrary to De Vos's contention, the conditions listed in the Notice Letter are not clearly indicative of waste on the premises. Charging lower room rates than surrounding hotels does not readily indicate that the property has been subjected to abuse. The low occupancy rate and management's decision not to maintain all rooms for rental are not indicators of waste either–especially in a hotel with over 200 rooms. The use of old furniture in rooms certainly does not result in lasting damage to the property. The only conceivable basis to construe the Notice Letter as a complaint of waste comes from the allegation that 1963 Jackson failed to repair the premises and replace furnishings and equipment. However, in making that allegation, De Vos cited Article 5 of the Lease as the basis for that default, not Article 8, which governs waste. According all reasonable presumptions against the party

-15-

seeking forfeiture of the Lease, we cannot say that the Notice Letter is reasonably construed as a complaint for waste. Based on the foregoing, we find that the trial court did not err in concluding that 1963 Jackson was not put on notice of waste prior to the Termination Letter.

### C. Consent to Assignment

De Vos contends that the trial court erred by holding that he unreasonably withheld consent to 1963 Jackson's assignment of the Lease to the Morgan Group. Pursuant to section 13.08 of the Lease, any assignment of the Lease required the written consent of the lessor, which "may not be unreasonably withheld or delayed."

In determining whether a landlord's withholding of consent is reasonable, we apply a reasonable commercial standard. *First American Bank of Nashville, N.A. v. Woods*, 781 S.W.2d 588, 590 (Tenn. Ct. App. 1989.) That standard is generally understood to include the elements of good faith and fair dealing. *Id.* The landlord cannot withhold consent solely to extract economic concessions or improve its economic position. *Dick Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM, Inc.*, No. E2010-01685-COA-R3-CV, 2011 WL 4954199, at *10 (Tenn. Ct. App. Oct. 19, 2011) (quoting *1010 Potomac Assocs. v. Grocery Manuf. Of Am., Inc.*, 485 A2d 199, 209-10 (D.C. 1984)). The "primary factor in determining whether the landlord acted in good faith and in a commercially reasonable manner is the 'financial responsibility of the proposed subtenant.'" *Woods*, 781 S.W.2d at 590 (quoting *Fernandez v. Vazquez*, 397 So.2d 1171, 1174 (Fla. Dist. Ct. App. 1981)). To determine whether consent was unreasonably withheld, we focus on the reasonableness of the landlord's perception that the proposed assignee presents financial or other risks. *Id.* We will therefore examine the exchange of information between the parties to determine whether De Vos's perception that the Morgan Group presented financial or other risks was reasonable.

In February 2010, 1963 Jackson and the Morgan Group entered an agreement wherein 1963 Jackson would assign its interest in the Lease to the Morgan Group in exchange for $850,000. Over the course of the next few months, the parties communicated with De Vos, seeking his consent to the assignment.

On March 2, the parties initially notified De Vos via email of their agreement to assign the Lease to the Morgan Group. 1963 Jackson requested that De Vos consent to the assignment. The email inquired what documents De Vos would need from the Morgan Group to consider the request.

On March 5, De Vos replied, requesting financial information on the Morgan Group and its shareholders so that he could determine whether it had the financial capability to meet

-16-

the terms and conditions of the Lease.

On March 11, the Morgan Group provided De Vos with the following: Articles of Incorporation for the Morgan Group, financial statements for Aggarwal and Kharat, the Morgan Group's shareholders, and Aggarwal's bank statement, investment account summary, commercial loan invoice, and tax return. The financial information showed that Aggarwal had a personal net worth of over $27 million and Kharat had a net worth of approximately $800,000. Aggarwal's personal financial statement indicated that he had $1.3 million in liquid assets, which he could readily convert to cash in order to finance the transaction.

On March 26, De Vos wrote another letter to Aggarwal requesting additional information. First, De Vos asked whether Aggarwal and Kharat would personally guarantee payment of all obligations under the Lease and post a cash security to secure those obligations. De Vos also asked that the Morgan Group provide information on Kharat's experience in hotel management, the source of cash to be used in purchasing the Lease, any plans to upgrade the Hotel, lines of credit to support the Hotel during an economic downturn, recent appraisals of Aggarwal's other hotel properties, and information on any third persons who would have input in management of the Hotel.

On May 5, after a failed attempt to buy the Hotel outright, the Morgan Group responded by letter to De Vos's March 26 inquiry. The letter expressed Aggarwal and Kharat's willingness to personally guarantee the Morgan Group's obligations under the Lease, while pointing that such a guarantee was not required by the Lease. The Morgan Group declined to post a cash security for its obligations as the better business practice would be to spend available money improving the Hotel. The letter outlined Aggarwal's and Kharat's many years of experience in the Hotel industry.[3] It represented that cash to purchase the Hotel would come from savings and that there would be no mortgage on the Lease. The letter stated that the Morgan Group would upgrade the property in accordance with the Lease provision's 5% cap on MRR expenditures. The letter indicated that appraisals of Aggarwal's

---

[3]Regarding Aggarwal's and Kharat's background experience, the letter stated:

Mr. Aggarwal has sixteen (16) years in the hotel/motel industry. He currently has operations at the Comfort Inn Downtown, Nashville; Best Western, Nashville; Holiday Inn, Metropolis, IL; Holdiay (sic) Inn and Quality Inn, Birmingham, AL. The Comfort Inn Downtown, Nashville was acquired as a Shoney's Inn in 2003 when it was doing 1.4 million in room revenue. Today this property does approximately 3.8 million in room revenue. Mr. Aggarwal is also CHA certified. Mr. Kharat has been managing the Comfort Inn from the day it was acquired. He is very knowledgeable about hotel management/operations and brand conversion. He has managed properties for eleven (11) years.

other properties was available. Finally, the letter provided that liquidity in an adverse economic climate would be sustained through the shareholder's personal guarantee.

On May 11, De Vos replied by email. Regarding Aggarwal's $1.3 million in liquid assets, De Vos stated that after purchasing the Lease for $850,000, the remaining $450,000 would not be a sufficient cushion against an economic downturn. De Vos requested specific plans, budgets, timetables, and sources of funds for upgrading the property. De Vos asked that the recent appraisals for Aggarwal's other hotel properties be provided. Finally, De Vos indicated that the Morgan Group had not provided a satisfactory account of Aggarwal's and Kharat's experience in Hotel management. De Vos stated that he had requested their experience as managers of hotel properties, not as investors.

On May 12, the Morgan Group responded, indicating that De Vos continued requests for information were "annoying." It stated that it had provided all of the requested information and that De Vos's refusal to consent to the assignment of the Lease was unreasonable. On the same day, Kharat emailed De Vos expressing his frustration with the delay and De Vos's "unreasonable" requests. Kharat contended that Aggarwal's $1.3 million in liquid assets was sufficient to ensure that the Morgan Group could purchase the Lease and still meet its subsequent financial obligations in an economic downturn. Kharat's email requested that the parties close the transaction expediently as the Morgan Group was already losing money it had spent on advertising the Hotel.

Finally, on May 31, De Vos notified Kharat that the Lease had been terminated and that further discussion of the proposed assignment was moot. De Vos indicated that he was willing to sell the property for $1.5 million. The Morgan Group declined De Vos's offer.

At trial, 1963 Jackson presented expert testimony indicating that the demands De Vos made of the Morgan Group were unreasonable. Drew Dimond, a hotel consultant with twenty-years of experience in the operation of hotels, testified that the financial information originally provided by the Morgan Group showed that its shareholders were financially able to pay rent. Dimond testified that in his opinion, De Vos's further requests in the March 26, 2010 letter were unreasonable. Dimond emphasized that especially after Aggarwal and Kharat volunteered to personally guarantee the Morgan Group's financial obligations under the Lease, De Vos's continued requests for information were unreasonable.

In arguing that his persistent inquiries were reasonable, De Vos stresses that the Morgan Group was a shell corporation with no assets and no prior hotel management history. However, Dimond testified that in transactions like the one at issue here, it is common business practice to set up a new entity for ownership of the lease and that De Vos should have known that. In Dimond's opinion, even though the Morgan Group itself had no

financial or hotel operations history, Aggarwal's personal guarantee of its obligations made De Vos's continued inquiries unreasonable.

De Vos further contends that he was not unreasonable to insist that any prospective assignee would generate a reasonable amount of percentage rent. The Lease states that the lessee will pay either the base rent ($4,350 per month) or 3% of annual guest room rentals, whichever is greater. De Vos relies on the cases from other jurisdictions for the proposition that where a lease contains a percentage rent clause, the landlord acts commercially reasonably when he refuses to consent to an assignment which will not generate the amount of rent the landlord might reasonably expect. *Toys "R" Us, Inc. v. NBD Trust Co. Of Illinois*, No. 88 C 10349, 1995 WL 591559, at *40 (N.D. Ill. Oct. 4, 1995) (citations omitted). De Vos urges the Court to adopt this rule. We note, however, that the rule requires that the landlord have "reasonable expectation" of percentage rent. The landlord still may not attempt to extract rental payments that are higher than those historically received or greater than what might reasonably be expected under the lease. *Id.* at *42.

In applying De Vos's proposed rule, we still cannot ignore the particular facts of this case. De Vos admitted that during the time 1963 Jackson was tenant, the Hotel never generated enough revenue to require rental payments above the base rent. Based on revenue reports in the record, it appears that the Hotel has not produced enough revenue to yield a percentage rent higher than the base rent since the first quarter of 2007.[4] The evidence shows that for several years, the Hotel's low revenues had rendered the percentage rent clause irrelevant. De Vos contends that the Morgan Group's indication that it would not invest more than the 5% cap on MRR expenditures justifies his decision to withhold consent to the assignment because it means that the Hotel would never produce percentage rent during its tenancy. Though the 5% cap may limit the lessor's ability to force the lessee to upgrade the Hotel, we do not think it is reasonable to withhold consent to an assignment because the proposed assignee indicates that it plans to exercise its explicit rights under the Lease.

Evidence also indicated that in the spring of 2010, De Vos was negotiating to sell the Hotel to another hotel management group, the Mehta Group. Emails between De Vos and the Mehta Group's attorney, Ed Wallis, showed that the Mehta Group's offer to purchase the Hotel was contingent on the termination of the Lease. In one email, Wallis explicitly told De Vos that the Mehta Group would like to see the assignment between 1963 Jackson and the Morgan Group fall through. The same email encouraged De Vos to find a reason to terminate the Lease. At trial, De Vos denied that his communications with Wallis affected his decision to withhold consent to the assignment.

---

[4]Section 3.02 of the Lease provides that accounting of revenues is to be submitted on a quarterly basis to determine whether percentage rent higher than the base rent is owed.

The trial court found, based on the totality of the evidence and the credibility of the witnesses, that the assignment from 1963 Jackson to the Morgan Group was commercially reasonable. We do not think that the evidence preponderates against that finding. The Morgan Group's shareholders were financially stable and willing to personally guarantee its financial obligations. The Morgan Group assured De Vos it would continue to upgrade the Hotel consistent with the 5% cap on MRR expenditures in the Lease. De Vos's insistence that the Morgan Group do more than is required by the Lease constituted an attempt to extract economic concessions. Based on the foregoing, we affirm the trial court's holding that De Vos unreasonably withheld consent to the transfer.

### D. Exclusion of Evidence on Insurance

De Vos contends that the trial court erred by disallowing evidence that the Lease was terminated based on 1963 Jackson's failure to adequately insure the Hotel. We afford a wide degree of latitude to trial courts in determining whether to admit or exclude evidence. *Ferguson Harbour Inc. v. Flash Market, Inc.*, 124 S.W.3d 541, 550 (Tenn. Ct. App. 2003). On appeal, we will only overturn the trial court's decision where there is a showing that the trial court abused its discretion. *Otis v. Cambridge Mut. Fire Ins. Co.*, 580 S.W.2d 439, 442-43 (Tenn. 1992). The trial court abuses its discretion when it causes an injustice to a party by applying an incorrect legal standard, reaching an illogical or unreasonable decision, or basing its decision on a clearly erroneous assessment of the evidence. *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

Section 10.01 of the Lease requires the lessee to maintain general liability insurance on the Hotel. On April 26, 2010, De Vos sent a letter to 1963 Jackson stating that it was in default of the Lease for failure to provide evidence of requisite insurance. Pursuant to the terms of the Lease, 1963 Jackson was given sixty days to cure the alleged default before the Lease could be terminated on that ground. On May 31, 2010, De Vos sent the Termination Letter, which purported to terminate the Lease based on physical breaches of the Lease by 1963 Jackson. At no time did De Vos indicate to 1963 Jackson that the Lease was terminated for its failure to maintain insurance on the Hotel.

De Vos admits that he never purported to terminate the Lease based on 1963 Jackson's failure to maintain insurance. Instead, he contends that he was not required to do so under the terms of the Lease. De Vos also argues that the Lease does not require express notice of each default that is grounds for termination, but merely a single notice of termination.

Section 15.01 of the Lease states that the Lease can only be terminated if one of several provisions is triggered. The trigger relevant here provides that if the lessee breaches

a covenant in the Lease, the lessor must notify the lessee of the breach and allow the lessee sixty days to cure the breach before the Lease may be terminated. After the sixty day cure period, the lessor must notify the lessee of the termination. De Vos notified 1963 Jackson of its breach for failure to maintain insurance on April 26, 2010. The subsequent Termination Letter on May 31, 2010 had no effect on that charge of default because the sixty day cure period had not passed. Only a notice of termination sent after the sixty day cure period would have been effective to terminate the Lease for failure to maintain insurance. Such notice was never sent. Pursuant to section 15.03 of the Lease, after six months, the April 26, 2010 notice of default became void. Based on the facts before us, it is clear that De Vos never purported to terminate the Lease based on 1963 Jackson's lack of insurance. We therefore find that the trial court did not abuse its discretion by declining to hear evidence on insurance as a grounds for termination of the Lease.

### E. Damages

Lastly, we turn our attention to the trial court's award of compensatory damages to 1963 Jackson. After De Vos sent the Termination Letter and withheld consent to the assignment, the Morgan Group backed out of its agreement with 1963 Jackson to purchase the Lease for $850,000. Instead, in August 2011, the Morgan Group purchased the stock of 1963 Jackson from U.S. Bank for $700,000 and proceeded to operate the property. The trial court found that the lower purchase price resulted in a $150,000 loss to 1963 Jackson, which was the direct result of De Vos's unreasonable refusal to consent to assignment of the Lease. De Vos contends that 1963 Jackson did not suffer any monetary loss and therefore should not be awarded compensatory damages.

Compensatory damages are intended to reimburse a party for the loss or injury caused by a wrongdoer's conduct. *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2004). The goal is to restore the injured party to the position it would have been in had the wrongful conduct not occurred. *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998).

Turning to the facts of the case, there is a question as to whether 1963 Jackson actually suffered any damages. 1963 Jackson entered an agreement to assign the Lease to the Morgan Group for $850,000. At the time, 1963 Jackson was wholly owned by U.S. Bank. After De Vos refused to consent to the assignment, U.S. Bank sold all of the shares of 1963 Jackson to the Morgan Group for $700,000. Therefore, it appears that U.S. Bank suffered the $150,000 loss resulting from De Vos's actions, not 1963 Jackson. U.S. Bank is not a party to this action and is therefore unable to collect damages.

It is also worth noting that De Vos's actions allowed the Morgan Group to acquire the

Lease at a price $150,000 lower than its original offer. By awarding 1963 Jackson $150,000 in damages, the trial court essentially rewarded the Morgan Group a second time. We decline to award the Morgan Group, now the owner of 1963 Jackson, an additional $150,000 on top of its savings. We therefore reverse the trial court's award of $150,000 in compensatory damages to 1963 Jackson.

1963 Jackson requests that this Court award its attorney's fees. We decline to do so in this case.

## V. CONCLUSION

For the aforementioned reasons, we affirm in part and reverse in part. Costs on appeal are taxed equally to the parties, 1963 Jackson, Inc. and Lloyd De Vos. This case is remanded for further proceedings consistent with this opinion.

_____

DAVID R. FARMER, JUDGE